[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 880 
The appellant, Billy Glen Biles, Jr., was convicted of reckless manslaughter, a violation of § 13A-6-3(a)(1), Ala. Code 1975, and of child abuse, a violation of § 26-15-3, Ala. Code 1975. The victim was Biles's three-year-old stepdaughter. He was sentenced to 20 years' imprisonment on the manslaughter conviction and to 10 years' imprisonment on the child abuse conviction, with the sentences to be served consecutively.
 I.
The appellant contends that the evidence was insufficient to support his convictions for manslaughter and child abuse.
 "In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution."
Faircloth v. State, 471 So.2d 485, 489 (Ala.Cr.App. 1984), aff'd, 471 So.2d 493 (Ala. 1985).
The evidence, viewed in the light most favorable to the state, was as follows:
The victim, Hannah Kelly, was born on July 7, 1992. The appellant and Hannah's mother, Tina Biles, married on June 10, 1995, when Hannah was almost three years old. Hannah began experiencing difficulties soon after the couple's marriage. The appellant's neighbors testified that they occasionally heard yelling, loud noises, and crying in the Biles's apartment. According to the neighbors, some of these noises sounded like someone was hitting a wall or another person. Hannah appeared withdrawn and frightened after the appellant moved into the apartment with her and her mother. In August 1995, she developed bruises all over her body and sustained injuries to both of her ears. Hannah told her maternal grandmother, Sandra Kelly, that the appellant had pulled her ears. Hannah eventually had to get medical treatment for the injuries to her ears.
Dr. Merritt Sechuel, a physician at the University of Alabama at Birmingham and Children's Hospital in Birmingham, testified that he treated Hannah on August 5, 1995, for a laceration to her right eardrum. He testified that the appellant explained that he had been cleaning Hannah's ear with a Q-tip, when she jumped, forcing the Q-tip deep into her right ear. Dr. Sechuel noticed blood in the ear canal. He irrigated the ear and wrote a prescription for medicine. He did not observe any other injury to Hannah.
Dr. Andy Wooley, a pediatric ear, nose, and throat specialist, testified that on August 7, 1995, Dr. Sechuel referred Hannah to him for treatment. Dr. Wooley saw a small blood clot in Hannah's right ear canal. He also observed a hematoma (blood underneath the skin) on the external portion of her right ear. He testified that this injury is unusual for a small child and "is caused by a shearing mechanism or twisting type injury to the ear [that is usually seen] in wrestlers . . . that get the ear twisted or boxed on the ear." (R. 430.) Dr. Wooley testified that the appellant explained that the injury might have occurred while he and Hannah wrestled. Dr. Wooley scheduled surgery for the next day to remove the hematoma, but the surgery was canceled because the hematoma had shrunk.
Dr. Wooley saw Hannah again on August 15, 1995, when she was admitted to Children's Hospital in critical condition. He observed several bruises on her body and significant bruising on both ears. Dr. Wooley noticed a much larger hematoma on her right *Page 881 
ear than he had seen on August 7. Dr. Wooley stated that this injury was probably caused by "twisting" and that "[i]n order for this [injury] to develop you have to actually twist the skin off the cartilage . . . that allows blood to develop between the skin and the cartilage. . . ." (R. 435.) He also testified that the injuries to her ears could have been caused by "someone actually picking Hannah up by her ears." (R. 435.)
Sandra Kelly, Hannah's maternal grandmother, testified that on August 12, 1995, she took Hannah to the park. When she brought Hannah home, the appellant accused Hannah of chewing the fingernail polish off her fingernails. When Hannah and Ms. Kelly denied it, the appellant became angry. The appellant testified that after Ms. Kelly left he confronted Hannah again. After Hannah confessed to chewing her fingernails, the appellant spanked her with his belt. The appellant testified that Hannah then urinated on the sofa and he "popped her with [the] belt" again. (R. 937.)
According to the appellant, later that evening, Hannah complained to him and her mother that her stomach hurt and then she vomited several times. She was ill for the next three days. On August 15, 1995, Ms. Kelly called the Bileses to inquire about Hannah. Ms. Kelly testified that the appellant told her that Hannah had "passed out" and that they "couldn't get her to come to." He then stated that "I hit her. I don't know how hard I hit her or where I hit her." (R. 180.) He informed her that paramedics were at the apartment and that Hannah was going to the hospital.
Stanley Pendergrass, a paramedic with the Cullman City Ambulance Service, transported Hannah to Cullman Regional Medical Center. He testified that Hannah was lethargic, and that her abdomen was swollen and her body was covered with bruises.
Dr. Robert Smith, a physician at Cullman Regional Medical Center, treated Hannah in the Center's emergency room. He testified that her body was covered with bruises and that her ears were swollen and bruised. He further testified that the injuries to her ears were likely caused by pinching or pulling the ears. The appellant and his wife explained that Hannah had fallen and hit her head and that she had then vomited for three days. The appellant said that the bruises were a result of his forceful attempts to revive Hannah. Dr. Smith ordered a CAT scan of Hannah's head and abdomen and discovered a perforation in her small bowel. He testified that this hole was probably caused by a blow to her abdomen. Hannah was flown by helicopter to Children's Hospital in Birmingham.
Dr. Keith Georgeson treated Hannah upon her arrival at Children's Hospital. He noted that Hannah was in shock and that her abdomen was severely distended. He testified that Hannah had several bruises on her body. The bruises on her legs appeared to have been caused by a strap or a belt and the bruises on her ears appeared to have been caused by forceful pulling or grabbing.
Dr. Georgeson surgically closed the hole in her bowel and sterilized her abdominal cavity, which had become contaminated. Despite his efforts, Hannah died as a result of the severe infection and dehydration that developed as a result of the hole in her bowel.
Dr. Georgeson estimated that Hannah's bowel had been perforated approximately three days before she was admitted to the hospital. Dr. Georgeson testified that the laceration to her bowel was probably caused by blunt force trauma to her abdomen. He further testified that such a blow would be extremely painful and that fluids leaking from her perforated bowel would cause a constant burning pain. He concluded that given the nature of the injury, it would have been obvious to anyone that Hannah was in extreme pain and that she needed prompt medical attention. Dr. Georgeson further concluded that the type of injury that Hannah sustained would not have been fatal if it had been treated promptly with surgery and antibiotics.
Dr. Georgeson sought information from the appellant and Hannah's mother regarding Hannah's medical history. At first, the appellant denied that Hannah had experienced any trauma. Some time later, the appellant claimed that he had slapped Hannah in an attempt to revive her after she *Page 882 
became ill. In another conversation, he stated that he might have hit her in the abdomen while attempting to revive her. The appellant then suggested that he might have hurt her while they were wrestling. Finally, the appellant claimed that he had tripped over Hannah and had fallen on her with his knee.
Max Bartlett, a Cullman City Police Investigator, interviewed the appellant concerning Hannah's injuries. Bartlett testified that the appellant told him that Hannah's abdominal injury was caused when he tripped over her and landed on her with his knee. On another occasion he stated that her injury occurred when they were wrestling. At trial, the appellant retracted all of his former statements concerning the cause of Hannah's abdominal injury.
Sonya Hahn, a former girlfriend of the appellant's, testified that, while they were cohabitating in 1991, the appellant physically and verbally abused her then 13-month-old son. Her son was eventually hospitalized as a result of injuries inflicted by the appellant, and she ended her relationship with the appellant.
The appellant was charged with child abuse, a violation of § 26-15-3, Ala. Code 1975, which provides as follows:
 "A responsible person, as defined in Section 26-15-2, who shall torture, willfully abuse, cruelly beat or otherwise willfully maltreat any child under the age of 18 years shall, on conviction, be punished by imprisonment in the penitentiary for not less than one year nor more than 10 years."
"A responsible person" is defined in § 26-15-2, Ala. Code 1975, as "a child's natural parent, stepparent, adoptive parent, legal guardian, custodian or any other person who has the permanent or temporary care or custody or responsibility for the supervision of a child."
The state presented considerable evidence concerning Hannah's injuries. The appellant had admitted to doctors and Hannah's grandmother that he had hit and slapped Hannah, but he had said he did not know how hard or where the blows had landed. In another version of how Hannah sustained her injuries, the appellant also claimed that he could have accidentally injured her while they were "wrestling" and/or that he had tripped over the child and fallen on her with his knee.
Moreover, there was compelling circumstantial evidence of the appellant's guilt. This Court has held that circumstantial evidence will support a conviction, provided that such evidence points to the guilt of the accused. Brandon v. State,542 So.2d 1316 (Ala.Cr.App. 1989). The test to be applied in reviewing a conviction based on circumstantial evidence is
 "whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude."
Cumbo v. State, 368 So.2d 871, 874 (Ala.Cr.App.), cert. denied,368 So.2d 877 (Ala. 1979).
 " ' "Whether circumstantial evidence tending to connect the defendant with the crime excludes, to a moral certainty, every other reasonable hypothesis than that of the defendant's guilt is a question for the jury and not the court." Our function is not to be factfinders, however tempting that may sometimes be. We must not substitute ourselves for jurors, nor play their role in the criminal process. Jury verdicts should not be disturbed unless they are not based upon evidence sufficient to meet the test set out above.' "
Parker v. State, 589 So.2d 773, 776 (Ala.Cr.App. 1991) (citations omitted), quoting Linzy v. State, 455 So.2d 260, 262
(Ala.Cr.App. 1984).
Given the doctors' testimony concerning the probable cause of Hannah's injuries, the fact that these injuries occurred only after the appellant began living with Hannah and her mother, the neighbors' observations of the Biles household, the appellant's admission that he had hit Hannah, the appellant's prior similar abuse of a former girlfriend's child and the appellant's inconsistent explanations for Hannah's injuries, we conclude that the state presented ample evidence from which the jury could conclude that the appellant was guilty of child abuse. *Page 883 
With respect to the appellant's manslaughter conviction, the appellant was charged in the indictment as follows:
 "BILLY GLEN BILES, JR., whose name is otherwise unknown to the Grand Jury, did recklessly cause the death of Hannah Elizabeth Kelly, by withholding medical attention and/or treatment from the said Hannah Elizabeth Kelly, in violation of Title 13A-6-3(a)(1) of the Code of Alabama. . . ."
(C.R. 104.)
Medical testimony established that Hannah sustained the injury to her bowel approximately three days before she was admitted to the hospital. By the time she arrived at the hospital, she was semi-conscious. There was undisputed testimony that had the appellant sought prompt medical treatment for Hannah, she would have survived. Instead, she was forced to endure intense burning pain and vomiting for three days. According to Dr. Georgeson, Hannah's pain was likely so severe that she would have had to lie still and would not have been able to engage in the normal activities of a three-year-old. Doctors testified that the seriousness of Hannah's injuries and her need for medical treatment would have been obvious to anyone. Moreover, there was evidence that her need for medical treatment should have been particularly obvious to the appellant, because he was enrolled in physical therapy classes at a local community college. Given this evidence, the jury could have reasonably concluded that the appellant consciously disregarded Hannah's need for medical treatment and thereby caused her death. Thus, the state presented abundant evidence to support the appellant's manslaughter conviction.
 II.
The appellant contends that the trial court erred in denying his motion for a judgment of acquittal on the manslaughter charge because, he says, a fatal variance existed between the indictment and the proof presented at trial.
Although the appellant moved for a judgment of acquittal at both the close of the state's case and at the close of all the evidence, he did not raise the issue of variance of proof at any time. "[T]his court has determined that issues as to a variance between the indictment and proof . . . are not preserved for review where they are not raised at trial."Turner v. State, 610 So.2d 1198, 1199 (Ala.Cr.App. 1992). Thus, the appellant's contention that there was a variance between the manslaughter indictment and the proof at trial was not preserved for our review.
 III.
The appellant contends that the trial court erred in admitting into evidence testimony concerning his prior bad acts. Specifically, the appellant contends that his former girlfriend was improperly permitted to testify concerning his past abuse of her infant son. We disagree.
Rule 404(b), Ala. R. Evid.,[1] provides:
 "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, . . . of the general nature of any such evidence it intends to introduce at trial."
The doctors who treated Hannah were unanimous in their opinion that the injury to her bowel was caused by a severe blow to her abdomen. Faced with this medical explanation for Hannah's injury, the appellant provided a variety of stories to police officers and doctors concerning how Hannah sustained this injury. Most of these stories included an assertion that he had fallen on her with his knee. At trial, however, the appellant recanted all of these stories and *Page 884 
claimed that he had never "kneed" Hannah. Instead, he suggested that Hannah had injured herself by falling off her rocking chair. He also implied that physicians treating Hannah had caused her injury. The appellant stated that he had lied to the police officers and the doctors in his prior statements, in part, he said, because he was trying to protect his wife, suggesting that she may have contributed to Hannah's injuries.[2] By presenting these alternative, often inconsistent stories, the appellant placed identity in issue. See Perkins v.State, 580 So.2d 4 (Ala.Cr.App. 1990). Thus, we conclude that the prior bad acts by the appellant were admissible in this case under the identity exception to the exclusionary rule. The following language concerning the identity exception is contained in McElroy's, Alabama Evidence § 69.01(8) (5th ed. 1996):
 "All evidence tending to prove a person's guilt of the now-charged crime may be said to identify him as the guilty person. However, the identity exception to the general exclusionary rule of character is much more specific in that it contemplates the situation where the now-charged crime was committed in a novel and peculiar manner and the prosecution is allowed to show that the accused has committed other similar crimes or acts, in the same novel and peculiar manner, in order to show the accused to be the perpetrator of the now-charged crime. The method of carrying out the charged crime and the collateral acts must be novel or peculiar and, because of this requirement, some refer to this as the 'signature crime' or 'modus operandi' exception."
In this case, the appellant's prior abuse of his former girlfriend's infant son was relevant to the instant charged offenses. Sonya Hahn testified that the appellant had wrestled with her baby and picked him up by the ears and "head-butted" him. (R. 569.) He had also "kneed" the child in the stomach. After living with the appellant for a few months, Ms. Hahn's son developed bruises all over his body, and, in particular, sustained unusual bruises on his ears, which were similar to the bruises on Hannah's ears.
The similarities between the appellant's abuse of his former girlfriend's baby and Hannah's abuse were striking. Apparently, the appellant wrestled aggressively with both children. Both children developed considerable bruising after the appellant entered their lives. In particular, both children sustained unusual bruises to their ears, ostensibly caused by the appellant grabbing their ears. Testimony established that the appellant's former girlfriend's son was "kneed" in the stomach by the appellant and, according to one version of the facts given by the appellant, Hannah was "kneed" in the stomach as well. Given the fact that the appellant's prior abuse of the male infant mirrored the abuse inflicted on Hannah and that both incidents of abuse were novel and peculiar, we conclude that the trial court properly admitted this evidence under the identity exception to the exclusionary rule.
In addition, given the similarity of the former girlfriend's son and Hannah — their ages and the fact that they lived with the appellant, but were not his offspring — and the similarity in the injuries sustained by both, we conclude that evidence of the appellant's prior acts was properly admitted under the absence-of mistake-or-accident exception to the exclusionary rule. See generally, Comment Admission of Evidence of OtherMisconduct Evidence in Washington to Prove Intent or Absence ofMistake or Accident: The Logical Inconsistencies of EvidenceRule 404(b), 61 Wn. L.Rev. 1213 (1986) (noting that where there is a great similarity between the victim of the charged offense and the victim of the prior misconduct and between the physical elements of the charged offense and the prior misconduct, admission of the prior misconduct for the purpose of establishing absence of mistake or accident is favored).
The difficulty presented in this case is that the appellant gave so many differing explanations for Hannah's injuries. Specifically, the appellant first told Dr. Wooley that he might *Page 885 
have unintentionally hurt Hannah when they were wrestling. He also told Dr. Georgeson and Investigator Bartlett that he had stumbled over Hannah and had fallen on her with his knee.
In addition, the appellant testified that someone else may have caused Hannah's injuries, either intentionally or accidentally. For example, as noted earlier, he testified that the doctors could have injured Hannah when they attempted to treat her or that Hannah's injury might have been the result of her "accidentally" falling out of her rocking chair.
Given these conflicting theories presented by the appellant, both before trial and at trial, we find that the appellant made accident an issue in this case. Thus, under the facts presented, evidence of the appellant's prior acts was properly admitted under both the identity and absence of mistake or accident exceptions to the exclusionary rule. We therefore hold that no reversible error occurred.
 IV.
The appellant contends that the trial court erred in admitting into evidence photographs of the victim because, he claims, the state failed to establish a proper predicate for their admission. He specifically refers to state's exhibit 2, which consisted of a sheet of four photographs and state's exhibit 9, which consisted of one photograph.[3]
The record reveals, however, that the appellant consented to the introduction of state's exhibit 2, as shown in the following colloquy:
 "[Defense counsel]: Let me just ask you one more question.
"A. Yes, sir.
 "Q. On State's Exhibit No. 2, photograph number 4, that is a side shot?
"A. Yes, sir.
 "Q. Now, I believe you said that you noticed an injury?
"A. Yes, sir.
"Q. But in the photograph —
"A. Yes.
 "Q. — is the injury lighter or darker than you saw the injury?
 "A. The injury — I don't know exactly how you — the injury on Ms. Kelly was a lot darker than it shows in this picture.
 "Q. All right. So in the photograph it's lighter, then?
"A. Yes, sir.
"Q. Than the injury you saw?
"A. Yes.
 "[Defense counsel]: Nothing further. We would have no objection to their being introduced into evidence.
"THE COURT: State's 2 is in. State's 3 is out."
(R. 86.)
Exhibit 2 was admitted at trial without objection; therefore, the appellant's contention that it was improperly admitted is not preserved for our review. Alexander v. State, 673 So.2d 791
(Ala.Cr.App. 1995).
State's exhibit 9 consisted of a photograph of Hannah's right ear. The appellant objected to the admission of this picture because the state's authenticating witness, Stanley Pendergrass, did not take the picture and did not observe the picture being taken.
The determination of the admissibility of a photograph is left to the sound discretion of the trial court and its decision will not be reversed absent a showing of abuse.T.R.D. v. State, 673 So.2d 838 (Ala.Cr.App. 1995). Two conditions must be satisfied in order for a photograph to be admitted into evidence. First, the picture must be properly authenticated; second, the photograph must tend to prove or disprove some relevant fact or must corroborate or disprove some other evidence offered or to be offered. Lewis v. State,465 So.2d 1185 (Ala.Cr.App. 1984).
 "A photograph may be authenticated by any witness who is familiar with the subject matter of the picture and who is able *Page 886 
to testify that the photograph is a substantially correct depiction of the relevant scene at the time of the event under inquiry. . . . It is not necessary that the witness who testifies to the correctness of the photograph shall have taken it or have seen it taken."
McElroy's Alabama Evidence § 123.03(3) (5th ed. 1996).
The state introduced exhibit 9 for the sole purpose of showing the injuries to Hannah's right ear. Pendergrass testified that the photograph accurately depicted the injuries to Hannah's ear that he saw when he transported the child to Cullman County Hospital the day before the picture was taken. The fact that Pendergrass did not take this picture and did not observe it being taken does not render the picture inadmissible. Because he was familiar with the subject matter of the picture — the injuries to Hannah's ear — the trial court did not err in admitting state's exhibit 9 into evidence.
 V.
The appellant contends that the trial court committed reversible error in admitting allegedly hearsay testimony into evidence. Specifically, he claims that Dr. Robert Smith was improperly permitted to testify concerning statements related to him by Hannah's primary care physician's assistant, Sharon Turner. The pertinent testimony was as follows:
 "[State]: During your examination [of the victim] at the emergency room there, Dr. Smith, did you discover that there, . . . was some injury to the jejunum or abdomen in some way?
 "[Dr. Smith]: Yes, sir. The process that went on as we initially stabilized the patient, wanted to get her rapidly to our CAT scan unit. . . . Wanted to get those CAT scans immediately. The child was disoriented and was going downhill hemodynamically just in her presentation that could have well been due to an active bleeding in her head and, of course, we did have the bruise to her ear, or it could have been a problem in her abdomen making her bleed out or massive infection in her abdomen. These were possibilities. So the CAT scan of the head, I had that done first . . .; it was negative. There was no blood or bleeding seen. The CAT scan of the abdomen showed free air. Free air means that there is a hole in the bowel somewhere, and that is what we needed to know. The head was okay. The belly was the problem.
 "[State]: As part of your history or fact gathering at that time did you make any inquiries or attempt to find out what Hannah's health history was, please sir?
 "[Dr. Smith]: Yes, sir. With the multiple bruises and the history of easy bleeding given me by the parents present, I wondered if that was indeed the case and whether this child had been a sickly child, had a lot of problems or had any evidence of prior bruising or bleeding. . . . I called Dr. Bostick's office to talk with Sharon Turner who is the physician assistant who to my understanding was normally who took care of Hannah's normal well-baby checks and that sort of thing. And so I talked with Sharon Turner by phone while the patient was still in the emergency department.
"[State]: And what did you find out?
 "[Defense counsel]: We object, Your Honor. That would be hearsay.
"THE COURT: Overruled.
 "[State]: Was this part of your history or part of your care of this patient?
 "[Dr. Smith]: It was very important to me to know whether or not she had a medical history of bruising or prior injuries — easy bruising or prior injuries.
And Sharon Turner —
 "[Defense counsel]: We would object again as to what she said. That would be hearsay.
"THE COURT: Overruled. You may answer.
 "[Dr. Smith]: Sharon Turner's response to me was one of surprise. She told me this child had been a healthy child and had not had any significant health problems to her knowledge.
 "[State]: Did you ask her specifically about the easy bruising and free bleeding? *Page 887 
 "[Dr. Smith]: Yes. I asked her specifically if she had any knowledge of easy bruisability in this child, and she told me that she had no knowledge of easy bruisability in this child."
(R. 133-35.)
Rule 803(4), Ala.R.Evid., states:
 "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
". . . .
 (4) STATEMENTS FOR PURPOSE OF MEDICAL DIAGNOSIS OR TREATMENT. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."
Rule 803(4) permits "all statements serving reasonably as the basis of diagnosis or treatment . . . [to be admitted] as substantive proof of the matter asserted." Ala.R.Evid. 803(4), Advisory Committee's Notes. In determining whether a statement comes within this hearsay exception, courts have applied a "two-pronged test." The first prong "is the requirement that the statement must be one upon which medical personnel reasonably rely in diagnosis and treatment. The second prong consists of a requirement that the declarant possess a motive which is consistent with the rule's underlying purpose . . . [of] seeking diagnosis or treatment." McElroy's AlabamaEvidence § 261.02(4) (5th ed. 1996).
In the instant case, Dr. Smith called Hannah's primary care physician in order to gather information that would assist him in treating and diagnosing her. Information concerning Hannah's medical history, including her alleged tendency to bleed or bruise easily, was pertinent to determining the cause of her grave condition and the prescribed course of treatment. Thus, Turner's statements were admissible under Rule 803(4), as Dr. Smith reasonably relied on Turner's statements in an effort to diagnose and treat Hannah. Further, Turner's statements were intended to assist Dr. Smith in his effort. Therefore, we find that the trial court properly allowed Dr. Smith to testify regarding Turner's statements to him.
 VI.
The appellant next contends that the trial court erred by restricting his cross-examination of a state witness, Stanley Pendergrass. Pendergrass, a paramedic with the Cullman City Ambulance Service, testified on direct examination that he was dispatched to the appellant's apartment to transport Hannah to Cullman Regional Medical Center. He testified that when he arrived at the apartment he noticed that she had a distended abdomen, scratches on her face and neck, and bruises on various portions of her body.
On recross-examination, the appellant attempted to ask Pendergrass the following questions:
 "Q: . . . Could you tell how old the bruises that you saw were?
"A: The bruises?
 "Q: Can you tell, the difference between a bruise that's —
 "[State]: I object. That is not a proper subject for . . . recross. Mr. Brooks did not go into any of that.
"THE COURT: Sustained. That is out of scope.
"[Defense counsel]: Nothing further. Thank you."
(C.R. 108.) The appellant contends that these questions were intended to show that Pendergrass "did not make any medical observations at the scene, and did not do any psychological observations at the scene, either." Appellant's brief pg. 73. However, the appellant failed to make a proffer of what he expected to prove by eliciting a response to the question. Moreover, the proposed question does not itself suggest the materiality or relevance of the question or the answer sought.Futral v. State, 558 So.2d 991 (Ala.Cr.App. 1989). Thus, the appellant has failed to preserve this contention for review. Even had the appellant demonstrated error by the trial court in limiting his cross-examination and, thus, preserved this issue for review, he *Page 888 
has failed to show that any such error "probably injured his substantial rights." Terry v. City of Montgomery,549 So.2d 566, 567 (Ala.Cr.App. 1989).
 VII.
The appellant contends that the trial court erred when it allowed his wife, Tina Biles, who was charged as a codefendant, but who had not yet been tried, to invoke her Fifth Amendment right not to testify outside the presence and hearing of the jury.
The Fifth Amendment privilege against self-incrimination may be invoked by a witness after only the witness has been sworn and asked a question that would elicit incriminating evidence if answered. J.D.S. v. State, 587 So.2d 1249 (Ala.Cr.App. 1991). Thus, in this case, the trial court improperly permitted Ms. Biles to "take the Fifth" without taking the stand and without having been asked a single question. However, the appellant failed to set out the questions that he intended to ask Ms. Biles and failed to make an offer of proof as to what he expected her testimony to prove. Thus, we find the language in Gwin v. State, 425 So.2d 500, 509 (Ala.Cr.App. 1982), cert. quashed, 425 So.2d 510 (Ala. 1983), to be dispositive:
 "Error cannot be predicated upon the trial court's refusal to compel the witness to testify unless the defendant made an offer of proof showing that the testimony he expected to elicit from the witness would not have been incriminating. Compare Murphy v. State, 108 Ala. 10, 18 So. 557 (1895); Patterson v. State, 37 Ala. App. 161, 66 So.2d 191, cert. denied, 259 Ala. 152, 66 So.2d 194 (1953). Since the witness only could have been required to answer any question which did not tend to incriminate him, but not others, the defendant should have made an offer of proof. To put the trial court in error in declining to allow a question to be answered, it must have been suggested what it was proposed to prove, and how it would be relevant and competent, unless the question in itself gave such information."
The appellant made no offer of proof; thus, this issue was not preserved for our review.
Based on the foregoing, the judgment of the trial court is due to be affirmed.
AFFIRMED.
All the Judges concur.
[1] The appellant was tried on June 24, 1996; thus, the Alabama Rules of Evidence, which became effective on January 1, 1996, apply.
[2] Notably, the appellant elicited testimony from Max Bartlett, a Cullman City police investigator, that the appellant had stated during an interview that he was "not the only one who hit [Hannah] or spanked her. Tina [Hannah's mother] hit her too." (R. 473.)
[3] In his brief, the appellant misidentifies state's exhibit 2, photograph 1, as state's exhibit 1, photograph 2. (Appellant's brief, pg. 57.) It is clear, however, that the appellant is alleging that state's exhibit 2 was improperly introduced.