2002 UT 67

**STATE of Utah, Plaintiff and Appellee,**

v.

**Andrew G. FEDOROWICZ, Defendant and Appellant.**

**No. 990807.**

Supreme Court of Utah.

July 19, 2002.

---

[blacked out text] ⟜92(5)

Mark L. Shurtleff, Att'y Gen., Karen A. Klucznik, Asst. Att'y Gen., Salt Lake City, for plaintiff.

D. Gilbert Athay, Michael R. Sikora, Salt Lake City, for defendant.

RUSSON, Justice:

¶ 1 Defendant Andrew Fedorowicz ("Fedorowicz") appeals his convictions of one count of felony murder, in violation of Utah Code Ann. § 76–5–203(1)(d) (1999), one count of child abuse, in violation of Utah Code Ann. § 76–5–109 (1999), and one count of sexual abuse of a child, in violation of Utah Code Ann. § 76–5–404.1 (1999). We affirm.

## BACKGROUND

¶ 2 This case is a criminal matter arising from the abuse and resulting death of three-year-old Rebecca Bluff ("Rebecca"), who died on October 21, 1998. "We view the facts in the light most favorable to the jury verdict and recite them accordingly." *State v. Loose*, 2000 UT 11, ¶ 2, 994 P.2d 1237.

¶ 3 In October 1998, Ferosa Bluff ("Bluff") traveled from Canada to stay in Utah with Fedorowicz and Fedorowicz's wife, Susanna. Bluff was accompanied by her daughters, Rebecca and two-year-old Sarah. Bluff and her daughters stayed with Fedorowicz and Susanna for approximately two weeks before October 21, 1998.

### I. OCTOBER 21, 1998

¶ 4 At approximately 3:00 p.m. on October 21, 1998, Life Flight and Salt Lake County paramedics and EMTs were dispatched to an apartment complex on the east side of the

Salt Lake Valley in response to a call that a child had fallen and was injured. When the paramedics arrived, Fedorowicz guided them to an upstairs bathroom in his apartment. After following Fedorowicz up the stairs, Captain Scott Shaw ("Shaw"), one of the EMTs, discovered Bluff giving CPR to Rebecca's lifeless body that lay naked on the bathroom floor.

¶ 5 Shaw testified that he noticed extensive bruising on Rebecca's body, extending from the middle of her back to below her buttocks. Shaw also noticed bruising on her legs and arms. As the paramedics began to attend to her injuries, Fedorowicz told Shaw that Rebecca had fallen down a staircase the prior afternoon. He told Shaw that he checked her out immediately after she fell and found no noticeable injury. Fedorowicz further mentioned that she ate breakfast the morning she died. However, Fedorowicz explained to Shaw that he noticed bruising on Rebecca's face that morning, but that he was unconcerned because she was acting normal. Shaw further testified Fedorowicz opined that the facial bruise was caused by either the fall or Rebecca's two-year-old sister hitting her with a doll.

¶ 6 When the emergency personnel arrived, they moved Rebecca into a room adjacent to the upstairs bathroom, where they attempted to resuscitate her. Initially, they attempted CPR and then they administered drugs to stimulate her heart. However, Rebecca never responded. Her skin was cold. Her core temperature measured between 32 and 33 degrees Celsius, indicative of severe hypothermia and that she had been injured for some time. Her pupils were fixed, dilated, and glazed. She was pale and blue, and her heart had no electrical activity.

¶ 7 Soon thereafter, Life Flight transported Rebecca to Primary Children's Medical Center. All attempts to resuscitate her failed, and she was pronounced dead soon after her arrival.

## II. THE INVESTIGATION

¶ 8 Sometime after the paramedics arrived on October 21, 1998, Fedorowicz was taken to a sheriff's car. While Fedorowicz was sitting in the patrol car with Salt Lake County deputy sheriff Jason Ashment, he stated that his "life [was] f-cked," he was the man of the house, he had been "the one who had to make decisions and take parental control" of Bluff's children, he should have called 911 sooner, and he had to spank Rebecca repeatedly over the two weeks preceding her death for disciplinary reasons. Further, Fedorowicz told Officer Ashment that while performing CPR, he noticed blood coming from "[w]here she pees."

¶ 9 Later that afternoon, Detective Steven Jentzch ("Jentzch"), investigating Rebecca's death, arrived at Fedorowicz's apartment. While there, Bluff informed Jentzch that she had been with both of her girls "24/7" since she arrived in Utah. She also told Jentzch that the girls were never alone with Fedorowicz or Susanna. Additionally, Fedorowicz told Jentzch that he spanked Rebecca the previous week to punish her for threatening to kill Sarah.

¶ 10 Afterward, Fedorowicz related the following to Jentzch: Fedorowicz did not become concerned about Rebecca until just before 3:00 p.m. on October 21. About that time, he noticed Rebecca was pale and was having trouble walking. When Rebecca finally fainted, he and Bluff took Rebecca into the bathroom, removed her clothes, and submerged her in a tub of cool water in an attempt to revive her. He noticed blood in the water. At one point, Rebecca responded to the cool water and regained consciousness: She actually spoke and drank some milk or orange juice. However, when Fedorowicz and Bluff removed Rebecca from the tub, she fainted again. At that point, Fedorowicz yelled for someone to call 911, and he and Bluff performed CPR on Rebecca.

¶ 11 In furtherance of the investigation and relying on a search warrant, investigators seized a whip-like cat-o'-nine-tails from Fedorowicz's office next to the upstairs bathroom. Additionally, the investigators seized two leather belts or straps adorned with brass rivets. The rivets of at least one of these straps resembled a figure eight. Further, the investigators seized a D-ring with leather straps on both sides of the ring that could be used to bind an individual's hands

and feet. Finally, the investigators seized a videotape that depicts Fedorowicz, Bluff, and Susanna engaging in consensual sexual activities.

### III. REBECCA'S INJURIES

¶ 12 At trial, several individuals testified concerning the extent of Rebecca's injuries and that those injuries resulted in her death. Specifically, Shaw and other paramedics that attended to Rebecca's injuries at the scene testified. Dr. Howard A. Kadish, the pediatric doctor who met Life Flight at the hospital, and Dr. Timothy J. Kutz, who examined Rebecca on October 21, 1998, also testified. Finally, Dr. Maureen Frikke, the state assistant medical examiner who conducted the autopsy on Rebecca's body, testified. According to their testimonies in the aggregate, Rebecca suffered the following injuries:

¶ 13 Rebecca suffered extensive bruising from her scalp to the bottoms of her feet. Her scalp was bruised both internally and externally. She hemorrhaged into the space between the skull and the brain, and her brain was bruised and bleeding.

¶ 14 Rebecca sustained massive and widespread bruising on her back and buttocks. Red dots, where the surface of Rebecca's skin had been scraped away, were also evident on her buttocks. The tissue to the left of her vagina was red and swollen. Her pelvis was also bruised.

¶ 15 Dr. Frikke opined at trial that the shapes, sizes, and patterns of the bruises on Rebecca's body were consistent with having been whipped with the whips and straps seized from Fedorowicz's apartment. Specifically, she testified that many of the bruises were in the shapes of figure eights, triangles, and teardrops. She noted other bruises were distinctly linear and parallel to one another. Comparing the shape of the rivets and other ornamentation on the straps seized from Fedorowicz's apartment to the shapes of Rebecca's bruises, Dr. Frikke testified that the shapes of the bruises were consistent with having been struck by the straps. In addition, other bruises were consistent with having been grabbed or pinched by someone's fingers and thumb. She also testified that the injuries on Rebecca's buttocks were consistent with the kind of injuries that would be caused by the cat-o'-nine-tails seized from the apartment. The bottoms of Rebecca's feet were covered with bruises consistent with having been beaten with a stick or rod. Further, Rebecca had matching abrasions around her ankles consistent with having been bound.

¶ 16 Dr. Kadish concluded that all of the bruises resulted from nonaccidental trauma rather than from a fall and that they could not have been inflicted by Rebecca's two-year-old sister. According to Dr. Frikke, Rebecca bled to death into the tissues of her buttocks, back, arms, and head. She concluded that death occurred because of blood loss occasioned by blunt force injuries inflicted on the surface of the body, which caused hemorrhaging into the skin, fat, and muscle. Further, Dr. Frikke testified that "these injuries would have been very, very painful" and that a "normal child would cry, or manifest pain, through irritability or crying."

¶ 17 Finally, according to the evidence at trial, Rebecca had no history of health problems before October 21, 1998, that would have resulted in her death. Specifically, Rebecca had no history of a blood disorder or disease that would have caused unusual bleeding.

### IV. TESTIMONY REGARDING VIDEOTAPE SCENES

¶ 18 At trial, Jentzch described the contents of two scenes from a videotape that was seized from Fedorowicz's apartment during the investigation. In the first scene, Susanna, Fedorowicz's wife, lay naked and face down on a waterbed with both her wrists and ankles bound with straps. Fedorowicz and Bluff, also naked, struck Susanna on her buttocks with whips or a cat-o'-nine-tails. Redness was evident where Susanna was struck.

¶ 19 In the second scene, Susanna was again naked and bound at the wrists and ankles, but this time she was supine on the waterbed. Bluff, also naked, struck Susanna on her genitalia with a wide, flexible leather strap while Fedorowicz, who was off camera, directed both women.

## V. PROCEDURAL HISTORY

¶ 20 On October 29, 1998, the State charged both Fedorowicz and Bluff with one count each of murder, child abuse, and sexual abuse of a child, all arising out of Rebecca's injuries and death. Before trial, Fedorowicz joined in a motion in limine filed by Bluff to exclude Jentzch's testimony regarding the sexually explicit scenes from the seized videotape. The trial court denied Fedorowicz's motion. In doing so, the trial court concluded that (1) the testimony was relevant to establish identity, knowledge, and lack of accident or mistake and (2) the testimony was more probative than prejudicial.

¶ 21 During trial, Fedorowicz moved to dismiss for insufficient evidence. He also moved the trial court to instruct the jury only on child abuse homicide rather than on the alternate theories of felony murder and child abuse homicide. The trial court denied these motions.

¶ 22 After a four-day trial, the jury found both Fedorowicz and Bluff guilty of felony murder, child abuse, and sexual abuse of a child, upon which the judge entered judgment. At sentencing, the trial court rejected Fedorowicz's claim that his convictions for child abuse and sexual abuse of a child merge with his felony murder conviction. The court sentenced Fedorowicz to consecutive sentences of five years to life on the felony murder conviction and one to fifteen years on both the child abuse and sexual abuse of a child convictions.

¶ 23 Fedorowicz appeals, arguing that his convictions should be reversed because the trial court erred by (1) permitting oral testimony describing the content of the sexually explicit videotape, (2) denying Fedorowicz's motion to instruct the jury only on child abuse homicide rather than on both felony murder and child abuse homicide, and (3) ruling that child abuse and sexual abuse of a child do not merge with felony murder. Fedorowicz also contends that the evidence was insufficient to support the jury's verdict and that the trial court erred by imposing consecutive sentences for his three convictions.

## ANALYSIS

### I. ADMISSIBILITY OF TESTIMONY DESCRIBING VIDEOTAPE CONTENTS

¶ 24 Fedorowicz first contends that the trial court erred by allowing into evidence Jentzch's testimony describing the content of two scenes of a videotape in which Fedorowicz, Bluff, and Susanna were engaged in consensual sexual activities involving the whips and straps allegedly used to inflict Rebecca's injuries. Specifically, Fedorowicz asserts that this testimony is inadmissible under Utah Rule of Evidence 404(b) because it is evidence of other wrongs or bad acts offered to prove only Fedorowicz's propensity to commit the crimes charged. We review a trial court's decision to admit evidence of other crimes, wrongs, or bad acts for an abuse of discretion. *State v. Bisner*, 2001 UT 99, ¶ 54, 37 P.3d 1073; *State v. Decorso*, 1999 UT 57, ¶ 18, 993 P.2d 837, *cert. denied*, 528 U.S. 1164, 120 S.Ct. 1181, 145 L.Ed.2d 1088 (2000). To properly exercise its discretion, a trial court "must 'scrupulously' examine the evidence before it is admitted." *State v. Widdison*, 2001 UT 60, ¶ 42, 28 P.3d 1278 (quoting *Decorso*, 1999 UT 57 at ¶ 18).

¶ 25 Rule 404(b) of the Utah Rules of Evidence precludes the admission of "[e]vidence of other crimes, wrongs or acts ... to prove the character of a person in order to show [that the person acted] in conformity therewith." Utah R. Evid. 404(b). However, such evidence can "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, *knowledge, identity, or absence of mistake or accident.*" *Id.* (emphasis added). Evidence of prior crimes, wrongs, or bad acts is admissible "if it is relevant for a non-character purpose and meets the requirements of Rules 402 and 403." *Id.*

¶ 26 In determining whether evidence of prior crimes, wrongs, or bad acts is admissible, the trial court must initially decide whether the evidence is offered for a proper, noncharacter purpose rather than only to show the defendant's propensity to commit the crime charged. *Bisner*, 2001 UT

99 at ¶ 55; *State v. Nelson–Waggoner,* 2000 UT 59, ¶ 18, 6 P.3d 1120. If the evidence is offered for a proper, noncharacter purpose, then the court must determine whether the proffered evidence is relevant under Utah Rule of Evidence 402. *Nelson–Waggoner,* 2000 UT 59 at ¶ 19. Finally, the trial court must determine whether the proffered evidence is admissible under Utah Rule of Evidence 403. *Id.* at ¶ 20.

### A. Noncharacter Purpose

■■■ ¶ 27 Initially, we review whether the State offered Jentzch's testimony concerning the contents of the videotape for a proper, noncharacter purpose. Under rule 404(b), evidence of other crimes, wrongs, or bad acts must be adduced for a proper, noncharacter purpose to be admissible. *State v. Mead,* 2001 UT 58, ¶¶ 61–62, 27 P.3d 1115; *Nelson–Waggoner,* 2000 UT 59 at ¶ 18. In other words, "to be admissible, [the] evidence must have probative value other than to show an evil propensity or criminal temperament." *State v. Reed,* 2000 UT 68, ¶ 24, 8 P.3d 1025.

¶ 28 After examining the State's proffered testimony regarding the videotape, the trial court concluded that the State offered Jentzch's testimony concerning the videotape for multiple proper, noncharacter purposes, including

> to establish the identity of persons who may have engaged in the intentional infliction of these bruises ... or persons who had knowledge of the use of the devices in question; and, moreover, to establish that there was not an accident as is alleged in the falling down of the stairs [sic]; and ... to address the position of the defendants that they are not the perpetrators of the massive injuries suffered by this victim.

However, Fedorowicz assails the trial court's ruling, asserting that the State could not offer the testimony regarding the contents of the videotape for a noncharacter purpose because (1) neither Fedorowicz nor Bluff asserted as a defense at trial that Rebecca's injuries resulted from an accident, (2) the testimony was not probative of knowledge with respect to how the whips and straps were used on Rebecca, and (3) the testimony

was not probative of the identity of Rebecca's abuser.

¶ 29 Nevertheless, the State did not offer Jentzch's testimony regarding the contents of the videotape for the purpose of establishing that Fedorowicz acted in conformity with bad character when committing the crimes charged. Rather, the State adduced the testimony to establish the identity of Rebecca's abuser and to establish that Fedorowicz was the individual who abused, and ultimately murdered, Rebecca. Fedorowicz acknowledges in his brief that the identity of Rebecca's abuser was at issue during trial. According to Jentzch's testimony, the two videotape scenes portrayed Fedorowicz using, and directing Bluff in using, whips and straps in a manner consistent with the bruises found on Rebecca's body. In other words, the testimony "laid out a pattern of behavior in which [Fedorowicz] engaged that was consistent with the pattern of behavior in which he engaged" with Rebecca, suggesting that Fedorowicz was the perpetrator. *Nelson–Waggoner,* 2000 UT 59 at ¶ 25. Because Rebecca's bruising was consistent with the manner in which Fedorowicz used the whips and straps shown in the videotape, the testimony is circumstantially probative that Fedorowicz was Rebecca's abuser, and therefore admissible for the noncharacter purpose of proving identity.

■ ¶ 30 Further, the State proffered Jentzch's testimony regarding the videotape to refute Fedorowicz's defense that Rebecca's injuries and death were occasioned by a fall down the stairs, some other accident, or a blood disorder. However, Fedorowicz contends that the trial court improperly admitted the testimony because he did not "present[] a defense that the injuries resulted from an accident." Nevertheless, Fedorowicz's contention is disingenuous because he clearly raised the defense that Rebecca died accidentally despite not affirmatively presenting that defense in his case-in-chief. Evidence is admissible under rule 404(b) to rebut a defense of accidental injury raised exclusively on cross-examination of the State's witnesses, irrespective of whether the defendant testifies or otherwise presents affirmative evidence of an accident. *United*

States v. Rivera–Sola, 713 F.2d 866, 871 (1st Cir.1983);[1] Biles v. State, 715 So.2d 878, 883–84 (Ala.Crim.App.1997); see also Walker v. State, 588 S.W.2d 920, 922 (Tex.Crim.App. 1979); State v. Widdison, 2000 UT App 185, ¶ 33, 4 P.3d 100. During the pretrial investigation of Rebecca's death, Fedorowicz told law enforcement officers investigating Rebecca's abuse and murder that Rebecca's injuries were likely sustained from a fall down a staircase or from another accidental source. Then at trial, while cross-examining the State's witnesses, Fedorowicz's counsel elicited testimony regarding Rebecca's alleged fall down the stairs, Bluff's children's "rough-housing," and other possible explanations germane to the causes of Rebecca's injuries.

¶ 31 Moreover, the State offered the testimony of the videotape contents to show Fedorowicz's knowledge concerning the use of the whips and straps. Fedorowicz employed the whips and straps in the videotape in a manner similar to the manner in which the experts testified that those same instruments were used to cause Rebecca's injuries. The testimony illustrated that Fedorowicz knew how to use those items so as to have been able to inflict Rebecca's injuries. Thus, the trial court remained within its permitted range of discretion in concluding that the testimony was offered for a proper, noncharacter purpose.

### B. Relevance Under Rule 402

¶ 32 Next, we address whether the testimony regarding the videotape is relevant under Utah Rule of Evidence 402. Evidence is admissible only if it is relevant. Utah R. Evid. 402. According to the rules of evidence, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R. Evid. 401. Further, even if otherwise relevant as defined by rule 401, evidence is irrelevant and inadmissible under rule 402 if the evidence is material and relevant to

prove only the defendant's proclivity to commit the crime charged. Nelson–Waggoner, 2000 UT 59 at ¶ 26. A trial court has broad discretion in deciding whether evidence is relevant, and we review a trial court's relevance determination for abuse of discretion. Kilpatrick v. Wiley, Rein & Fielding, 2001 UT 107, ¶ 95, 37 P.3d 1130; see also State v. Real Prop. at 633 E. 640 North, Orem, 942 P.2d 925, 929–30 (Utah 1997).

¶ 33 The relevance of the testimony regarding the videotape is manifested by the content of the videotape itself. In the videotape, Fedorowicz used or directed others in the use of the cat-o'-nine-tails, the strap with a chain, and the leather strap, which were introduced as exhibits at trial, as the instruments used to inflict Rebecca's injuries. Dr. Maureen Frikke's testimony that Rebecca's "bruising injuries were consistent with intentional striking, and that the injuries observed that were patterned[] were inflicted by items which are similar" to the whips and straps that allegedly caused Rebecca's injuries laid the foundation requisite to establish the relevance of the testimony regarding the videotape contents. The testimony regarding the videotape was probative of intentional striking, the identity of Rebecca's assailants, and the origin of Rebecca's injuries to repudiate any allegation that Rebecca's demise was accidental.

¶ 34 Allowing this testimony into evidence tended to make both the State's and Fedorowicz's theories regarding the issues of intent, identity, and causation more probable and less probable, respectively, than they would have been without the testimony. The testimony was not pertinent to show only Fedorowicz's predisposition to commit the crimes charged. Therefore, the trial court did not abuse its discretion in determining that the testimony regarding the videotape is relevant to this case under rule 402.

### C. Probative Value Versus Prejudicial Effect Under Rule 403

¶ 35 Finally, we review whether the trial court abused its discretion in determining

---

1. Although the Federal Rules of Evidence are a separate body of law from the Utah Rules of Evidence, if the reasoning of a federal case interpreting or applying a federal evidentiary rule is cogent and logical, we may freely look to that

case, absent a Utah case directly on point, when we interpret or apply an analogous Utah evidentiary rule. Langeland v. Monarch Motors, Inc., 952 P.2d 1058, 1062 n. 4 (Utah 1998); Hansen v. Heath, 852 P.2d 977, 979 (Utah 1993).

that the probative value of the testimony regarding the contents of the videotape is not substantially outweighed by any unfair prejudice. Fedorowicz contends that even assuming Jentzch's testimony regarding the videotape is probative of the issues at trial, "the likelihood of unfair prejudice of the description of sadomasochistic sexual conduct among consenting adults substantially outweighed its relevance." "A trial court's decision to admit evidence under rule 403 of the Utah Rules of Evidence is reviewed for an abuse of discretion." *State v. Kell*, 2002 UT 19, ¶ 24, —— P.3d ——, 2002 WL 193025.

¶ 36 Under rule 403, evidence can be excluded, even if relevant, "if its probative value is substantially outweighed by the danger of unfair prejudice." Utah R. Evid. 403. Exercising its discretion to determine whether evidence is admissible under rule 403, a trial court must consider a multiplicity of factors,

> including the strength of the evidence as to the commission of the other [wrong], the similarities between the [wrong and the crime charged], the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

*State v. Reed*, 2000 UT 68 at ¶ 29.

¶ 37 In this case, Jentzch's testimony was highly probative. The testimony was not only relevant, but it was essential to proving various issues at trial. Most of the evidence presented to the jury was circumstantial. The paucity of direct evidence regarding the perpetrator's identity, the origin of Rebecca's injuries and death, and Fedorowicz's intent necessitated Jentzch's testimony regarding the videotape because it tended to establish these issues. Further, the manner in which Fedorowicz used, and directed others in using, the whips and straps in the videotape was unmistakably similar to the State's allegations with respect to the manner in which the crimes charged were committed.

¶ 38 In addition, Jentzch's testimony concerning selected scenes from the videotape was a relatively sterile and nonprejudicial method with which to appropriately filter irrelevant, extraneous, and potentially inflammatory scenes or details from presentation to the jury, mitigating the danger of unnecessarily rousing the jury to overmastering hostility. Jentzch's testimony was narrowly confined to the manner in which Fedorowicz employed the whips and straps. Accordingly, the high probative value of the testimony outweighs any potential prejudice to Fedorowicz. Therefore, the trial court did not abuse its discretion in allowing into evidence the testimony under evidentiary rules 402, 403, and 404(b).

## II. SUFFICIENCY OF THE EVIDENCE

¶ 39 Fedorowicz next contends that the State adduced insufficient evidence at trial to establish that "he was the person responsible for the injuries sustained by the victim and which led to her death."

[17–20] ¶ 40 When we examine a challenge to the sufficiency of the evidence supporting a jury verdict, we review the evidence and all inferences reasonably drawn therefrom in the light most favorable to the jury verdict. *State v. Honie*, 2002 UT 4, ¶ 44, —— P.3d ——, 2002 WL 27738; *State v. Widdison*, 2001 UT 60, ¶ 74, 28 P.3d 1278. We also assume that the jury believed the evidence that supports the verdict. *Widdison*, 2001 UT 60 at ¶ 74; *State v. Boyd*, 2001 UT 30, ¶ 14, 25 P.3d 985. We will reverse a jury conviction "for insufficient evidence 'only if the evidence presented at trial is so insufficient that reasonable minds could not have reached the verdict.'" *Widdison*, 2001 UT 60 at ¶ 74 (quoting *State v. Colwell*, 2000 UT 8, ¶ 40, 994 P.2d 177). Further, in reviewing the sufficiency of the evidence, we refuse to "re-evaluate the credibility of witnesses or second-guess the jury's conclusion." *Honie*, 2002 UT 4 at ¶ 44.

¶ 41 At the outset, we note that the evidence connecting Fedorowicz to Rebecca's fatal injuries is largely, if not completely, circumstantial. Nevertheless, we will affirm Fedorowicz's convictions so long as the circumstantial evidence connecting him to the crimes charged is sufficient. *State v. Brown*,

948 P.2d 337, 344 (Utah 1997); *State v. Nickles*, 728 P.2d 123, 126 (Utah 1986).

¶ 42 In the instant case, the State presented sufficient evidence for the jury to reasonably conclude that Fedorowicz was responsible for Rebecca's injuries and death. To prove that Fedorowicz was responsible for the child abuse, and consequently responsible for the resulting murder, the State was required to prove that Fedorowicz "intentionally or knowingly" inflicted upon Rebecca "serious physical injury" or, "having the care or custody of such child, [intentionally or knowingly] cause[d] or permit[ted] another to inflict serious physical injury upon" her. Utah Code Ann. § 76-5-109(2)(a) (1999).

¶ 43 The State introduced overwhelming expert testimony that, as Fedorowicz concedes, supports the conclusion that Rebecca sustained serious, nonaccidental physical injuries and died from those injuries, leaving open only the question of the identity of the perpetrator. Sufficient evidence was presented to the jury to justify its finding that Fedorowicz inflicted Rebecca's fatal injuries. The State elicited testimony that Fedorowicz repeatedly spanked Rebecca. Additionally, the State presented the whips and straps, which were readily accessible to Fedorowicz and which were seized from his apartment, that likely produced the patterned bruises on Rebecca's body. Specifically, the State presented the cat-o'-nine-tails seized from Fedorowicz's office that likely caused the bruising on Rebecca's buttocks and backside. Further, the State proffered Jentzch's testimony regarding the videotape showing Fedorowicz using, and directing the use of, the whips and straps on another's genitalia and buttocks. This evidence was sufficient to justify the jury's conclusion that Fedorowicz was responsible for Rebecca's fatal injuries because it illustrated that Fedorowicz used the whips and straps on another consistently with the manner in which they were used on Rebecca.

¶ 44 Moreover, the State proffered sufficient evidence to show that Fedorowicz had the "care or custody" of Rebecca and intentionally or knowingly "permitted another to inflict serious physical injury." Utah Code Ann. § 76-5-109(2)(a). The evidence shows that Fedorowicz had custody of and control over Rebecca at the time she was abused and murdered. This evidence showed that Rebecca stayed in Fedorowicz's home, he prepared meals for her, and he allegedly investigated her injuries when she purportedly fell down a staircase. Further, he told Officer Ashment that he was the man of the house, he had to make decisions regarding Bluff's children, he had to take parental control of Bluff's children, and he had to spank Rebecca repeatedly for disciplinary reasons during the two weeks Bluff and Rebecca stayed in his home. Further, the expert testimony established that Rebecca's injuries would have been extremely painful and that she would have cried or otherwise expressed extreme discomfort so that Fedorowicz would have clearly known that she had been injured for a period of time before she passed out on October 21, 1998.

¶ 45 From this evidence, the jury could have reasonably concluded that Fedorowicz either inflicted Rebecca's fatal injuries or that he permitted another to inflict those injuries while Rebecca was in his care or custody. Therefore, the State adduced sufficient competent evidence to support Fedorowicz's conviction.

### III. *SHONDEL* DOCTRINE

¶ 46 The trial court instructed the jury with respect to felony murder under section 76-5-203(1)(d), a first degree felony, and child abuse homicide under section 76-5-208, a third degree felony. Fedorowicz contends that under the *Shondel* doctrine, the "trial court erred in denying [his] motion to instruct the jury only on child abuse homicide," instead of instructing it on both murder and child abuse homicide. Under *State v. Shondel*, if two statutes criminalize the same conduct but have disparate penalties, then an individual can be charged only under the statute carrying the lesser penalty. 22 Utah 2d 343, 346, 453 P.2d 146, 148 (1969); *see also State v. Loveless*, 581 P.2d 575, 577 (Utah 1978).

¶ 47 Pursuant to *Shondel* and its progeny, if one or both of the crimes at issue "require[] proof of some fact or element not required to establish the other," the statutes

do not criminalize identical conduct and the State can charge an individual with the crime carrying the higher classification or more severe sentence. *State v. Clark*, 632 P.2d 841, 844 (Utah 1981); *see also State v. Honie*, 2002 UT 4, ¶ 21, —— P.3d ——, 2002 WL 27738 (stating that when elements of crimes differ, no equal protection violation under *Shondel* lies); *State v. Bryan*, 709 P.2d 257, 263 (Utah 1985) (holding that *Shondel* doctrine applies only when "two statutes are wholly duplicative as to the elements of the crime").

¶ 48 In *Bryan*, we explained the purpose of the *Shondel* doctrine:

Equal protection of the law guarantees like treatment of all those who are similarly situated. Accordingly, the criminal laws must be written so that there are significant differences between offenses and so that the exact same conduct is not subject to different penalties depending upon which of two statutory sections a prosecutor chooses to charge.

709 P.2d at 263. Nevertheless, *Shondel* does not preclude a prosecutor from choosing between two different crimes in charging an individual for particular conduct; rather, it requires that a prosecutor who elects to charge an individual with a crime carrying a higher penalty or classification do so knowing that the prosecutor will be required to prove at least one additional or different element to obtain a conviction for the higher-penalty crime. The *Shondel* doctrine applies only when a prosecutor can charge an individual with two distinct crimes that have disparate penalties or classifications but identical elements, and the prosecutor's decision to charge either crime is founded solely upon the vagary of the prosecutor.

¶ 49 Accordingly, to determine if the trial court erred by instructing the jury on both felony murder and child abuse homicide, we must compare the plain language of the felony murder and child abuse homicide statutes to resolve whether they prohibit the same conduct and whether the elements of each crime are "wholly duplicative." *Bryan*, 709 P.2d at 263. Because the determination of whether two statutes proscribe the same conduct is a matter of statutory construction,

it is a question of law that we review for correctness. *State v. Green*, 2000 UT App 33, ¶ 5, 995 P.2d 1250; *see also State v. Lusk*, 2001 UT 102, ¶ 11, 37 P.3d 1103.

¶ 50 The felony murder statute, as it existed when the State charged Fedorowicz, provided:

Criminal homicide constitutes murder if the actor:

. . .

(d) while in the commission, attempted commission, or immediate flight from the commission or attempted commission of . . . sexual abuse of a child, . . . or *child abuse, as defined in Subsection 76–5–109(2)(a)*, when the victim is younger than 14 years of age, causes the death of another person other than a party as defined in Section 76–2–202. . . .

Utah Code Ann. § 76–5–203(1)(d) (1999) (emphasis added). The child abuse homicide statute, as it existed when defendant was charged, provided:

Criminal homicide constitutes child abuse homicide if the actor causes the death of a person under 17 years of age and the death results from child abuse, as defined in Subsection 76–5–109(1):

(a) if done recklessly as provided in Subsection 76–5–109(2)(b);

(b) if done with criminal negligence as provided in Subsection 76–5–109(2)(c); or

(c) if done with the mental culpability as provided in Subsection 76–5–109(3)(a), (b), or (c).

*Id.* § 76–5–208(1) (1999).

¶ 51 To determine whether the felony murder and child abuse homicide statutes are wholly duplicative, we must determine whether all the elements of the respective crimes are identical. Thus, we must first determine whether the mens rea, or intent, element is identical, and then we must determine whether the same conduct is proscribed.

### A. Mens Rea

¶ 52 Fedorowicz argues that the felony murder and child abuse homicide statutes are

duplicative because the requisite mens rea for both felony murder and second degree felony child abuse homicide is recklessness. Specifically, Fedorowicz asserts that the mens rea for felony murder is recklessness under section 76–5–102. However, we recently held that the mental state required to prove felony murder is "the mens rea associated with the underlying charged felony." *Honie*, 2002 UT 4 at ¶ 25. In other words, the State need prove only the intent required to commit the underlying felony and that the defendant "causes the death of another human being," Utah Code Ann. § 76–5–201(1)(a), "while in the commission, attempted commission, or immediate flight from the commission or attempted commission" of the underlying felony, *id.* § 76–5–203(d). In this case, because the predicate felony underlying the applicability of the felony murder rule was child abuse, the mental state required was the intent to commit the underlying child abuse.

¶ 53 According to the plain language of the felony murder statute, for child abuse to serve as a predicate felony of felony murder, a defendant must be guilty of child abuse as defined in subsection 76–5–109(2)(a). The mental state required under that subsection is "intentionally or knowingly." *Id.* § 76–5–109(2)(a). Thus, child abuse committed recklessly that results in the death of a child, while possibly resulting in a conviction for child abuse homicide under section 76–5–208(1)(a), cannot result in felony murder because recklessly committing child abuse can never serve as the predicate felony under our statutory scheme.

¶ 54 Nevertheless, despite Fedorowicz's unavailing argument, intentional or knowing child abuse can serve as the predicate offense for both felony murder and child abuse homicide. Under subsection 76–5–208(1)(c), a defendant may commit third degree child abuse homicide when the death of a child results from intentional or knowing child abuse under section 76–5–109(3)(a). Inasmuch as a defendant could be charged with either felony murder or third degree felony child abuse homicide if a child died as a result of the "intentional or knowing" commission of child abuse, we must determine whether the other elements of these two crimes are wholly duplicative.

### B. Other Elements

¶ 55 Although felony murder predicated upon child abuse and third degree felony child abuse homicide under subsection 76–5–208(1)(c) have the same requisite mens rea, the two crimes are completely dissimilar because a conviction of felony murder based upon the predicate felony of child abuse under subsection 76–5–109(2)(a) requires the prosecutor to prove that the victim suffered "serious physical injury," whereas a conviction of child abuse homicide based upon intentional and knowing child abuse under subsection 76–5–109(3)(a) requires that the prosecutor prove that the victim suffered "physical injury" only.

¶ 56 The child abuse statute clearly differentiates between "serious physical injury" and "physical injury." Utah Code Ann. § 76–5–109(1)(c), (d). Indeed, section 76–5–109(1) explicitly defines both "physical injury"[2] and "serious physical injury,"[3] and

---

**2.** Section 76–5–109(1)(c) defines "physical injury" as

an injury to or condition of a child which impairs the physical condition of the child, including:

(i) a bruise or other contusion of the skin;

(ii) a minor laceration or abrasion;

(iii) failure to thrive or malnutrition; or

(iv) any other condition which imperils the child's health or welfare and *which is not a serious physical injury as defined in Subsection (1)(d).*

Utah Code Ann. § 76–5–109(1)(c) (1999) (emphasis added).

**3.** Section 76–5–109(1)(d) defines "serious physical injury" as

any physical injury or set of injuries which seriously impairs the child's health, or which involves physical torture or causes serious emotional harm to the child, or which involves a substantial risk of death to the child, including:

(i) fracture of any bone or bones;

(ii) intracranial bleeding, swelling or contusion of the brain, whether caused by blows, shaking, or causing the child's head to impact with an object or surface;

(iii) any burn, including burns inflicted by hot water, or those caused by placing a hot object upon the skin or body of the child;

(iv) any injury caused by use of a dangerous weapon as defined in Section 76–1–601;

those definitions are mutually exclusive. Accordingly, a prosecutor must prove "serious physical injury" as an additional element of the underlying predicate offense of child abuse to procure a conviction of felony murder.

¶ 57 In the instant case, the trial court instructed the jury that it could convict Fedorowicz of felony murder only if it concluded beyond a reasonable doubt that Fedorowicz committed child abuse in that he "intentionally or knowingly inflict[ed] upon Rebecca] *serious physical injury* or, having the care or custody of such child, intentionally or knowingly cause[ed] or permit[ted] another to inflict *serious physical injury*" upon her. (Emphasis added.) The trial court further instructed the jury with respect to the definition of "serious physical injury" contained in section 76–5–109(d). Thus, the trial court impliedly instructed the jury that it could convict Fedorowicz of only child abuse homicide if the prosecution failed to prove that Rebecca's injuries were "serious" as defined by statute.

¶ 58 Therefore, the elements of felony murder and child abuse homicide are not wholly duplicative and the trial court appropriately instructed the jury with respect to both felony murder and child abuse homicide.

## IV. MERGER

¶ 59 Fedorowicz next argues that the trial court erred by concluding that his child abuse and sexual abuse of a child convictions did not merge with his felony murder conviction. The Utah Code provides: "A defendant may be convicted of an offense included in the offense charged but may not be convicted of both the offense charged and the included offense." Utah Code Ann. § 76–1–402(3) (1999). Under section 76–1–402(3)(a), an offense is included and must be

merged with the greater offense "when . . . [i]t is established by proof of the same or less than all of the facts required to establish the commission of the offense charged." Indeed, a lesser included offense must be merged into a greater offense if the defendant could not have committed the greater without having necessarily committed the lesser. *State v. Wood*, 868 P.2d 70, 89 (Utah 1993), *overruled on other grounds by State v. Mirquet*, 914 P.2d 1144 (Utah 1996); *State v. Shaffer*, 725 P.2d 1301, 1313 (Utah 1986). We determine whether one offense is the lesser included offense of another offense " 'by comparing the statutory elements of the two crimes as a theoretical matter and, where necessary, by reference to the facts proved at trial.' " *Wood*, 868 P.2d at 89 (quoting *State v. Hill*, 674 P.2d 96, 97 (Utah 1983)). Whether the trial court erred in denying the motion to arrest judgment when it concluded that the predicate offenses did not merge with the felony murder conviction is a question of law that we review for correctness. *See generally Wood*, 868 P.2d at 88–90.

¶ 60 Fedorowicz's merger argument fails. We have already held that a conviction for felony murder does not merge with its underlying predicate felony. *State v. McCovey*, 803 P.2d 1234, 1239 (Utah 1990); *see also State v. Bisner*, 2001 UT 99, ¶ 62, 37 P.3d 1073. In *McCovey*, we explained:

[T]he Utah State Legislature did not intend the multiple crimes of felony murder to be punished as a single crime, but rather, that the homicide be enhanced to second degree felony murder in addition to the underlying felony. To conclude otherwise would be to defeat the deterrent purpose of the felony murder statute and result in unjust consequences. A true lesser

---

(v) any combination of two or more physical injuries inflicted by the same person, either at the same time or on different occasions;
(vi) any damage to internal organs of the body;
(vii) any conduct toward a child which results in severe emotional harm, severe developmental delay or retardation, or severe impairment of the child's ability to function;
(viii) any injury which creates a permanent disfigurement or protracted loss or impairment

of the function of a bodily member, limb, or organ;
(ix) any conduct which causes a child to cease breathing, even if resuscitation is successful following the conduct; or
(x) any conduct which results in starvation or failure to thrive or malnutrition that jeopardizes the child's life.
Utah Code Ann. § 76–5–109(1)(d) (1999).

included relationship does not exist in the felony murder statute. . . .

803 P.2d at 1239; *see also Bisner,* 2001 UT 99 at ¶ 63. In *Bisner,* we affirmed that our holding in *McCovey* was premised "on the legislature's intent in enacting" the felony murder statute. *Bisner,* 2001 UT 99 at ¶ 63. Moreover, Fedorowicz's reliance on *Shaffer* is misplaced because *Shaffer* is inapposite in that it addresses section 76–5–202 of the Utah Code, the aggravated murder statute, rather than section 76–5–203(d), the felony murder statute. *Id.* Therefore, the trial court correctly determined that Fedorowicz's convictions for child abuse and sexual abuse of a child do not merge with Fedorowicz's conviction for felony murder.

## V. CONSECUTIVE SENTENCES

 ¶ 61 Finally, Fedorowicz challenges the trial court's imposition of consecutive sentences for his three felony convictions. Fedorowicz contends that the "most compelling reason supporting concurrent sentences in this case is the fact that the causation for homicide was the identical conduct supporting convictions for child abuse and sexual abuse of a child." He also contends that his sentences should run concurrently because he did not have a prior criminal history.

¶ 62 The Utah Code provides:

A court shall determine, if a defendant has been adjudged guilty of more than one felony offense, whether to impose concurrent or consecutive sentences for the offenses. Sentences for state offenses shall run concurrently unless the court states in the sentence that they shall run consecutively.

Utah Code Ann. § 76–3–401(1) (1999). A trial court "shall consider the gravity and circumstances of the offenses and the history, character, and rehabilitative needs of the defendant in determining whether to impose consecutive sentences." Utah Code Ann. § 76–3–401(4).

 ¶ 63 Trial courts are vested with "wide latitude and discretion in sentencing." *State v. Woodland,* 945 P.2d 665, 671 (Utah 1997). Hence, we review a trial court's imposition of consecutive sentences for an abuse of discretion. *State v. Helms,* 2002 UT 12,

¶ 8, 40 P.3d 626; *State v. Galli,* 967 P.2d 930, 938 (Utah 1998).

¶ 64 In this case, the trial court considered the factors enumerated in section 76–3–401(4). Considering the factors, the trial court stated that this crime was "heinous." It explained:

This child suffered multiple blunt-force injuries diagnosed as non-accidental and these injuries were inflicted at least within 72 to 24 hours prior to the child's death. To suffer the type of injuries the child obviously suffered would have resulted in extreme pain.

Indeed, there was evidence that Rebecca's injuries were so serious that Rebecca's death occurred because of loss of blood occasioned by those injuries inflicted on the surface of the body, which caused hemorrhaging into the skin, fat, and muscle of her body.

¶ 65 Moreover, the trial court noted that Fedorowicz expressed indifference to Rebecca's death and that "there was no indication by [Fedorowicz] that the child was in extremes before approximately 3:15 in the afternoon when she died." Further, Fedorowicz has not argued that the trial court did not address any of the factors of the statute.

¶ 66 Additionally, despite Fedorowicz's contention that his sentences should run concurrently because identical conduct supported those convictions, the Utah Code provides: "A court may impose consecutive sentences for offenses arising out of a single criminal episode. . . ." Utah Code Ann. § 76–3–401(5); *see also State v. Deli,* 861 P.2d 431, 433 (Utah 1993). Thus, the trial court did not abuse its discretion in sentencing Fedorowicz to consecutive sentences.

## CONCLUSION

¶ 67 In conclusion, the trial court correctly received into evidence the oral testimony regarding the sexually explicit videotape under Utah Rule of Evidence 404(b). Further, sufficient evidence supported the jury verdict. In addition, the trial court correctly instructed the jury on both felony murder and child abuse homicide, correctly concluded that Fedorowicz's convictions do not merge, and did

not abuse its discretion in concluding that Fedorowicz's sentences should run consecutively.

¶ 68 Chief Justice Durham, Associate Chief Justice Durrant, Justice Howe, and Justice Wilkins concur in Justice Russon's opinion.