2009 UT 23

**STATE of Utah, Plaintiff and Respondent,**

v.

**Ryan Brett ROBBINS, Defendant and Petitioner.**

No. 20060885.

Supreme Court of Utah.

April 17, 2009.

Rehearing Denied May 26, 2009.

Mark L. Shurtleff, Att'y Gen., Jeffrey S. Gray, Asst. Att'y Gen., William K. Kendall, Patricia Parkinson, Salt Lake City, for respondent.

John Pace, Salt Lake City, for petitioner.

PARRISH, Justice:

## INTRODUCTION

¶ 1 In December 2003, when she was ten years old, Taylor M. first accused her stepfather, Ryan Brett Robbins, of "touch[ing] her in an area where nobody has tried to touch her." The only evidence of the alleged incident was Taylor's testimony, and many factors suggested that the allegations of abuse were motivated by animus between Taylor's father and Robbins. *See* Utah Code Ann. § 76–5–404.1 (2003). Robbins was charged with one count of aggravated sexual abuse of Taylor. He was also charged with three counts of aggravated sexual abuse of Taylor's older sister, Whitney, who came forward with her own allegations against Robbins after hearing Taylor's. The jury convicted Robbins of abusing Taylor but acquitted him of three counts of abusing Whitney. The trial judge later expressed that he was "rather surprised with the verdict" and that there was "more to [the allegations] than just he said/she said." He queried "what do I do in a situation where ... all kinds of collateral issues ... suggest that [Taylor's] testimony may not be credible?" Nonetheless, he denied Robbins' Motion to Arrest Judgment.

¶ 2 Robbins appealed his conviction to the court of appeals, which affirmed. It held that Taylor's testimony provided sufficient evidence for the jury to find beyond a reasonable doubt that Robbins intended to gratify his sexual desires and that the trial court could not disregard her testimony as inherently improbable. *State v. Robbins*, 2006 UT App 324, ¶¶ 11, 19, 142 P.3d 589. We granted certiorari to review whether the court of appeals misconstrued the scope of the inherent improbability doctrine. We hold that it did and accordingly reverse.

## BACKGROUND AND PROCEDURAL HISTORY

¶ 3 Taylor's mother ("Mother") and father ("Father") divorced in 1996, in part because of a brief affair between Mother and Robbins in 1992. At the time of the divorce, the court awarded Mother primary custody of Taylor and her older sister Whitney, with Father receiving standard every-other-weekend and mid-week visitation. Two years later, when Taylor was five years old, Mother married Robbins. At some point the following year, Whitney moved in with Father, who then moved for primary custody of both girls. That petition was still pending at the time of Robbins' trial in 2004.

¶ 4 In 2001, Father made a complaint to DCFS, alleging that Robbins was verbally and physically abusing Taylor. Before contacting Robbins or Mother, a DCFS investigator interviewed Taylor at her school where Taylor told the investigator that she had never been spanked or hit by Robbins, was never told she was not loved, and was never told anything that made her feel uncomfortable or sad. Indeed, Taylor reported that she felt comfortable and safe at home. DCFS closed the investigation, concluding that the allegations lacked merit.

¶ 5 Just four weeks later, Father sought an ex parte protective order from the juvenile court prohibiting any contact between Robbins and Taylor. Father alleged that Robbins physically abused Taylor daily while berating her. The petition did not mention the recent DCFS investigation, nor did it allege that any bruising had occurred as a

result of the physical abuse. Though the juvenile court granted the order, which required Robbins to leave his home and immediately transferred custody of Taylor from Mother to Father, Mother's legal counsel obtained judicial dissolution of the order the next day.

¶ 6 As a result of the petition for protective order, DCFS again investigated Father's allegations of abuse, this time in more detail. As evidence of the alleged abuse, Father provided the investigator with a log that he had kept of incidents of abuse, a tape recording made by his older daughter Whitney recounting what she believed was abuse of Taylor, and a recording of a telephone call Taylor made to him. A different investigator from DCFS interviewed Taylor, who again said she felt safe at home. Taylor told the investigator that Robbins had spanked her once lightly with a book. She also told the investigator .that the only person she was afraid of was her step brother, Father's stepson, who would come up behind her and hit her unexpectedly. The investigator found that Father's abuse log contained third-hand allegations not proven by the evidence and that Whitney's tape-recorded allegations had no supporting evidence. Taylor's distress in the recorded ·phone call appeared to be caused by the earlier DCFS investigation. The investigator noted that "[i]t appears that there has been some coaching take place" with regards to the abuse allegations. Although the investigator found that the abuse allegations were without merit, he recommended that Taylor begin counseling due to the discord between her parents.

¶ 7 Taylor began attending regular counseling sessions in 2001, at first weekly and then monthly. In September 2003, Robbins and Mother separated as a result of Robbins' alcoholism. Prior to their separation, Taylor witnessed a loud argument between them, which "really freaked her out." Taylor told her counselor about the alleged incident of sexual abuse on December 11, 2003, over three years after the incident allegedly occurred. Shortly thereafter, Whitney came forward alleging that she too had been abused in a remarkably similar manner. Robbins was charged with four counts of

aggravated sexual abuse of a child under Utah Code section 76–5–404.1(3)(h) (2003).

¶ 8 Taylor's recollection of the alleged sexual abuse incident suffered from multiple inconsistencies. Taylor changed the age at which the abuse occurred from nine to seven. At the preliminary hearing, when attorneys asked why Taylor said the abuse first occurred when she was nine and then changed her story to seven, she replied that she had a hearing problem like her grandfather, a fact objectively not true. Taylor also changed the description of what she was wearing at the time of the alleged incident from fleece pants and a long sweater, to a nightgown, and then to a long nightgown that came to her ankles. The initial vague allegation Taylor reported to her counselor became much more specific after she discussed it with Whitney, who then came forward with her own similar abuse allegations. Taylor also gave more specific details of the alleged incident, elaborating that the touching lasted twenty seconds, that Robbins held his hand still for the duration, that he touched her over the top of her pajamas, and that when she slapped his hand, he left.

¶ 9 At trial, when asked if Robbins ever spoke to her about the incident, she replied, "Not that I remember. *I think that maybe once he might have said* that if I ever told anyone he would do it again or he would hit me more." (Emphasis added). But later in her testimony, Taylor reported that she did not tell anyone about the abuse when it happened "[b]ecause I had always been told that if I told anyone about him abusing me he would abuse me more, or he would threaten to kill my dog, or something like that." When asked why she did not report this abuse to either of the DCFS investigators, she claimed that she was afraid "because somebody told me there was going to be someone hiding in the closet and listening to everything that I said." Taylor did not identify who told her that someone would be hiding in the closet. Further, the first DCFS interview took place in a room without a closet and was conducted before Robbins and Mother were informed of the allegations, so neither would have had the opportunity to

tell her that someone would record her conversation.

¶ 10 In addition to the inconsistencies in Taylor's testimony surrounding the alleged incident of sexual abuse, other inconsistencies arose with regard to her allegations of routine physical abuse. In 2001, Taylor told the first investigator that Robbins never hit her. She told the second investigator that he once tapped her lightly with a book. But by January 2003, she told the detective that Robbins had hit her "a couple of times," and several days later she told the DCFS investigator that once a week or so, when Robbins was drunk, he would hit her on the back with his hand or a book, leaving marks at least once. At trial, Taylor changed her story yet again, alleging that about once a week for four years Robbins would, without talking to her and without apparent provocation, come into Taylor's room, pull a book from the shelf and hit her with it for a few minutes. She testified that she did not think Robbins was ever drunk when he hit her because "when he was drinking he didn't act like that. He would just fall asleep." Though these allegations of physical abuse do not bear directly on the alleged incident of sexual abuse, they reflect the pattern of inconsistency pervading Taylor's testimony.

¶ 11 At the three-day trial, defense attorneys highlighted the inconsistencies in Taylor's testimony and established their theory that the accusations were a result of the discord between Father and Robbins. The jury convicted Robbins of one count of aggravated sexual abuse of Taylor, but acquitted on the three counts relating to Whitney. The court denied Robbins' Motion to Arrest Judgment, stating that "it could not say that [Taylor's] testimony was inconclusive or inherently improbable to the extent that reasonable minds [the jurors] must have had to entertain a reasonable doubt.... The fact that the Court might have reached another result is not relevant to the inquiry on defendant's Motions." Robbins was sentenced to five years to life in prison.

¶ 12 The court of appeals upheld Robbins' conviction, holding that there was sufficient evidence to support his guilt beyond a reasonable doubt and that it did not have the discretion to reassess Taylor's testimony because it was not inherently improbable and because the suspect portions of her testimony did not go to the core of the offense. *State v. Robbins,* 2006 UT App 324, ¶¶ 19–20, 142 P.3d 589.

## ISSUES AND STANDARD OF REVIEW

¶ 13 We granted certiorari to address the scope of the inherent improbability doctrine, particularly in what instances a court may find witness testimony sufficiently improbable to disregard it when determining if sufficient evidence exists to sustain a conviction. We review the court of appeals' interpretation of the inherent improbability criteria for correctness. *See Pohl, Inc. of Am. v. Webelhuth,* 2008 UT 89, ¶ 8 201 P.3d 944. We hold that Taylor's testimony was so inherently improbable that the trial court had discretion to disregard it when considering whether sufficient evidence supported Robbins' conviction.

## ANALYSIS

I. THE COURT OF APPEALS COULD DISREGARD TAYLOR'S INHERENTLY IMPROBABLE TESTIMONY WHEN CONSIDERING WHETHER THERE WAS ENOUGH EVIDENCE TO SUPPORT THE JURY VERDICT

¶ 14 "A conviction not based on substantial reliable evidence cannot stand." *State v. Ramsey,* 782 P.2d 480, 483 (Utah 1989) (finding insufficient evidence to sustain a jury verdict convicting the defendant of sexual abuse of a child). On a motion to arrest judgment, the court may only reverse a jury verdict when "the evidence is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted." *State v. Bluff,* 2002 UT 66, ¶ 63, 52 P.3d 1210 (internal quotation marks omitted); *see also State v. Workman,* 852 P.2d 981, 983 (Utah 1993). "When reviewing any challenge to a trial court's denial of [a motion to] arrest ... judgment, we review the evidence and all reasonable inferences that may fairly be drawn therefrom in the light most

favorable to the jury verdict." *State v. Colwell*, 2000 UT 8, ¶ 11, 994 P.2d 177; *see also State v. Fedorowicz*, 2002 UT 67, ¶ 40, 52 P.3d 1194 (stating that court must "assume that the jury believed the evidence that supports the verdict"). A jury can convict on the basis of the "uncorroborated testimony of the victim." *State v. Sisneros*, 581 P.2d 1339, 1343 (Utah 1978); *see also Bowles v. Indiana*, 737 N.E.2d 1150, 1152 (Ind.2000) ("A victim's testimony, even if uncorroborated, is ordinarily sufficient to sustain a conviction for child molesting.").

¶ 15 "The standard for determining whether an order arresting judgment is erroneous is the same as that applied by an appellate court in determining whether a jury verdict should be set aside for insufficient evidence." *Workman*, 852 P.2d at 984. Normally, a trial court's denial of a defendant's sufficiency of the evidence challenge lends further support to the jury's verdict. *Bluff*, 2002 UT 66, ¶ 63, 52 P.3d 1210.

¶ 16 "[N]otwithstanding the presumptions in favor of the jury's decision this Court still has the right to review the sufficiency of the evidence to support the verdict." *State v. Petree*, 659 P.2d 443, 444 (Utah 1983). Though the court must ordinarily accept the jury's determination of witness credibility, when the witness's testimony is inherently improbable, the court may choose to disregard it. *Workman*, 852 P.2d at 984. Importantly, when reviewing the sufficiency of the evidence, the "burden of proof ... may under appropriate circumstances affect the degree of deference extended by an appellate court to findings of fact." *State ex rel. Z.D. v. State.*, 2006 UT 54, ¶ 27, 147 P.3d 401. It is "more difficult to demonstrate that the evidence supporting a 'preponderance' based outcome is so wanting ... than it is to demonstrate the required dearth of evidence under a more exacting evidentiary standard." *Id.* ¶ 40. In a criminal case, where the burden of proof is beyond a reasonable doubt, the trial court may afford less deference to inherently improbable, inconsistent, uncorroborated witness testimony than in a civil case where the plaintiff must only establish its claim by a preponderance of the evidence. "The evidence, stretched to its utmost limits, must be sufficient to prove the defendant guilty beyond a reasonable doubt." *Petree*, 659 P.2d at 445. We noted in *Workman* dicta that witness testimony is inherently improbable and may likewise be disregarded if it is (1) physically impossible or (2) apparently false. 852 P.2d at 984.

¶ 17 Testimony is physically impossible when what the witness claims happened could not have possibly occurred. If Taylor had testified that the molestation occurred on the moon, her testimony would have been inherently improbable because it is physically impossible for that to have occurred. On the other hand, testimony is apparently false if its falsity is "apparent, without any resort to inferences or deductions." *Id.* (internal quotations marks omitted). The court of appeals applied a narrow definition of "apparently false," holding that it required the testimony to be "improbable by its very nature." *State v. Robbins*, 2006 UT App 324, ¶ 17, 142 P.3d 589. It also held that "the inherently improbable testimony must ... go to the very core of the offense." *Id.* ¶ 18. Under this interpretation, unless the witness's testimony is impossible, not just incredible, and concerns the core elements of the crime, not just the circumstances surrounding it, the judge must uphold the jury's verdict. Such a standard is narrow to the point of being meaningless. Substantial inconsistencies in a sole witness's testimony, though not directed at the core offense, can create a situation where the prosecution cannot be said to have proven the defendant's guilt beyond a reasonable doubt, particularly as here where other significant factors in the case suggest a lack of credibility.

¶ 18 To prevent unappealable injustice, we hold that the definition of inherently improbable must include circumstances where a witness's testimony is incredibly dubious and, as such, apparently false. Accordingly, when considering a motion to arrest judgment, a trial judge may reevaluate the jury's determination of testimony credibility in cases "where a sole witness presents inherently contradictory testimony that is equivocal or the result of coercion, and there is a complete lack of circumstantial evidence

of guilt." *Bowles,* 737 N.E.2d at 1152; *see also Iowa v. Smith,* 508 N.W.2d 101, 103 (Iowa Ct.App.1993) (" 'The testimony of a witness may be so impossible and absurd and self-contradictory that it should be deemed a nullity by the court.' " (quoting *Graham v. Chi. & Nw. Ry. Co.,* 143 Iowa 604, 119 N.W. 708, 711 (Iowa 1909))). We stress, however, that the court may choose to exercise its discretion to disregard inconsistent witness testimony only when the court is convinced that the credibility of the witness is so weak that no reasonable jury could find the defendant guilty beyond a reasonable doubt.

¶ 19 Contrary to the court of appeals' view, such a rule would not allow defendants to challenge witness testimony for "generalized concerns about a witness's credibility." *Robbins,* 2006 UT App 324, ¶ 17, 142 P.3d 589. Rather, the trial court could reevaluate the jury's credibility determinations only in those instances where (1) there are material inconsistencies in the testimony and (2) there is no other circumstantial or direct evidence of the defendant's guilt. The existence of any additional evidence supporting the verdict prevents the judge from reconsidering the witness's credibility. *See White v. Indiana,* 706 N.E.2d 1078, 1080 (Ind.1999) (refusing to reconsider witness testimony when other witness testimony and circumstantial evidence supported the conviction).

¶ 20 This "inherent improbability" standard has been adopted by other jurisdictions, including by the court in *Iowa v. Smith,* where an Iowa court used it to overturn a jury verdict based only on the incredible testimony of child witnesses who had motive to lie. 508 N.W.2d 101. In *Smith,* the court found the child's testimony of sexual abuse to be "inconsistent, self-contradictory, lacking in experiential detail, and, at times, border[ing] on the absurd." *Id.* at 103. Smith was convicted of molesting his two stepdaughters.

*Id.* at 102. The girls maintained that their stepfather had molested them at a lake retreat and during a birthday party. *Id.* at 103–104. When asked about details of the abuse, such as whether the defendant touched her clothes or her skin and the length of the time of the abuse, one stepdaughter responded "I don't know" to each question. *Id.* at 104. Her reports of the location, time, and frequency of the abuse varied considerably. *Id.* When confronted with inconsistencies in her story, she responded "I'm not sure about any of them. I think I guessed . . . ." *Id.* The other stepdaughter began responses about what the defendant did "with 'probably' or 'might have been' as if she were trying to fill in details she never experienced." *Id.* Because of the inconsistencies in the stepdaughters' testimonies, the court considered other undisputed circumstantial factors to find that the evidence did not support the jury verdict. *Id.* at 104–05. The court considered that there was significant conflict between the stepdaughters' mother and father to the extent that the father had threatened to file abuse and neglect charges, that witnesses testified that the stepdaughters enjoyed being with the defendant, and that nobody besides the girls ever witnessed any inappropriate behavior—even those who were supposedly in or near the room where the abuse occurred. *Id.* at 105. Because there was "insufficient credible evidence for a rational jury to find appellant guilty beyond a reasonable doubt," the court reversed Smith's conviction and remanded for acquittal. *Id.*

¶ 21 This court has previously established that a judge may "disregard or discount as incredible evidence that is not capable of supporting a reasonable belief" of a defendant's guilt in the context of making a decision whether to bind over a defendant. *State v. Virgin,* 2006 UT 29, ¶ 25, 137 P.3d 787.[1] In *Virgin,* the prosecution appealed a

---

1. At first glance, it would appear that a magistrate's decision whether to bind a defendant over for trial is inapposite to a motion to arrest judgment after a jury has rendered a verdict. However, "the quantum of evidence necessary to support a bindover is less than that necessary to survive a directed verdict motion." *State v. Clark,* 2001 UT 9, ¶ 16, 20 P.3d 300. In other words, a magistrate needs less evidence to bind a defendant over for trial than a trial judge needs to deny a motion to arrest judgment. On bindover, the prosecution must only produce "believable evidence of all the elements of the crime charged." *Id.* ¶ 15 (internal quotation marks omitted). If we allow a magistrate to refuse to bind over a defendant for trial because he finds

magistrate judge's decision not to bind the defendant over to face charges of aggravated sexual abuse of a child. 2006 UT 29, ¶ 1, 137 P.3d 787. The alleged victim, a four-year-old girl, claimed that while Virgin was babysitting her, he "touched her between her legs and showed her his penis." *Id.* ¶ 8. Though the child consistently maintained that a touching occurred in the upstairs bathroom, she changed other details of the story between 2000, when the abuse allegedly occurred, and 2002, when detectives reactivated the case. *Id.* ¶¶ 5–9. When asked about the bathroom, she described a different bathroom than the one where the molestation allegedly occurred. *Id.* ¶ 9. In describing the events of the evening of the molestation, she told the investigator that she went rollerblading on pink and white mermaid skates, when she did not actually own any rollerblades at all. *Id.* ¶ 4. Further, a person present in the house the evening of the alleged abuse testified that the girl did not appear to be distressed. *Id.* ¶ 11. The magistrate found the child's testimony incapable of supporting a reasonable belief a crime was committed and refused to bind the defendant over for trial. We affirmed that decision, reasoning that "when evidence becomes so contradictory, inconsistent, or unbelievable that it is unreasonable to base belief of an element of the prosecutor's claim on that evidence," the judge need not credit it. *Id.* ¶ 25. A judge considering a motion to arrest judgment has the same leeway to determine whether a witness's testimony is so incredible that it could not have supported an essential element of the charge.

■ ¶ 22 In this case, the court of appeals affirmed the trial judge's holding that he could not disregard Taylor's incredibly dubious testimony in considering Robbins' motion to arrest the judgment. But the trial judge's assumption that he must credit Taylor's testimony was erroneous. Taylor's testimony, which was the sole evidence supporting Robbins' guilt, contained many inconsistencies. Taylor's denial of any abuse to two investigators, her inconsistent accounts regarding the extent of the physical

testimony to be too incredible to constitute believable evidence, we cannot logically deny a trial judge the ability to disregard such incredible

abuse she suffered, her age when the abuse occurred, and what she was wearing at the time of abuse may alone be insufficient to invoke the inherent improbability exception. *State v. Robbins,* 709 P.2d 771, 773 (Utah 1985) ("We recognize that children are often not able to identify with a high degree of reliability, and sometimes not at all, when an event in the past took place."). And certainly the patently false statements that Taylor made to cover up these inconsistencies are sufficient to allow the court to reassess her credibility on a motion to arrest judgment.

¶ 23 Taylor made up a story about a hearing problem to account for the discrepancy in the age when the abuse occurred. She also reported fearing that someone in a closet eavesdropped during her conversations with the first DCFS investigator, even though the conversation took place in a room without a closet before Mother or Robbins could have told her about a potential eavesdropper. In addition, Taylor never conclusively stated who told her not to tell about the physical and sexual abuse or what the consequences would be for telling. Further, Taylor went from reporting absolutely no physical abuse in 2001 to reporting at trial that Robbins beat her with a book once a week. At one point, she claimed Robbins was drunk when he beat her, but at trial she claimed that he was not drunk because he would usually sleep when he was drunk. Because Taylor's testimony is the sole evidence that a crime was even committed, and because no other evidence points to Robbins' guilt, these inconsistencies are sufficient to have allowed the trial judge to reevaluate Taylor's credibility when considering the motion to arrest judgment.

■ ¶ 24 On sufficiency of the evidence review, we normally afford weight to the trial court's denial of a motion to arrest judgment. But in this case, the trial judge, though constrained by an unduly narrow construction of the inherent improbability doctrine, was clearly troubled by the jury verdict. In the

evidence in a context requiring more conclusive evidence of guilt, such as a motion to arrest judgment.

hearing on the motion to arrest judgment, the trial judge expressed his concern:

> [I]f someone said, he touched me, he said I did not, then okay, the jury believes somebody. But there's a lot more to this case than that.... There [were] former denials of any of that kind of stuff, there was all this business going on about custody.... I know from the fact from sitting here for 22 plus years, that there is nothing more emotionally driven than divorce proceedings involving children and custody.... [T]here's nothing like fury that a husband has when somebody ... [has] an affair with [his] wife. Those things are serious business here.... [W]hat do I do in a situation where there [are] all kinds of collateral issues that would suggest that [Taylor's] testimony might not be credible?

Thus, the trial court's denial of Robbins' motion to arrest judgment does not lend support to upholding the conviction.

## CONCLUSION

¶ 25 Based on the trial judge's stated concerns and the clear record of inconsistencies in Taylor's testimony, and in light of the clarification of our inherent improbability standard that we announce today, we reverse the court of appeals and remand with instructions for the trial court to enter an acquittal.

¶ 26 Chief Justice DURHAM, Associate Chief Justice DURRANT, and Justice NEHRING concur with Justice PARRISH'S opinion.

¶ 27 Justice WILKINS dissents.