*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 13**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

ANTHONY JAMES PRATER,
*Appellant.*

No. 20130748
Filed March 7, 2017

On Direct Appeal

Third District, Salt Lake
The Honorable Robin W. Reese
No. 071909449

Attorneys:

Sean D. Reyes, Att'y Gen., Daniel W. Boyer, Asst. Solic. Gen.,
Salt Lake City, for appellee

Joel J. Kittrell, Kristina H. Ruedas, Salt Lake City, for appellant

JUSTICE PEARCE authored the opinion of the Court
in which CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE DURHAM, and JUSTICE HIMONAS joined.

JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1   A jury convicted defendant Anthony James Prater of aggravated murder and obstructing justice, both first-degree felonies. The jury also convicted Prater on five counts of discharging a firearm from a vehicle, a third-degree felony. At trial, three witnesses testified that Prater confessed to the crime, and one witness testified that he was there when Prater pulled the trigger. Forensic evidence supported the eye-witness's trial testimony. The district court also admitted a letter Prater had authored that

suggested he had committed the murder. The district court sentenced Prater to life in prison without the possibility of parole. Prater appeals his convictions, arguing that much of the witness testimony was inherently improbable and therefore the State did not present evidence sufficient to permit a reasonable jury to find him guilty on any of the counts.

¶2 We affirm Prater's convictions.

## BACKGROUND[1]

¶3 In the early morning of November 27, 2007, T.W. drove Vincent Samora to a 7-Eleven. When she parked, T.W. noticed a silver Jeep in the parking lot.

¶4 Ryan Sheppard, the Jeep's owner, sat in the driver's seat. Sheppard was accompanied by his friend Prater. Sheppard recognized Samora, who was sitting in T.W.'s car, and pointed him out to Prater. Prater had been searching for Samora for months. In 2005, one of Prater's colleagues, Christopher Archuletta, shot Samora in the stomach. Samora later identified Archuletta as the shooter to police and testified at Archuletta's preliminary hearing. The State anticipated calling Samora to testify at Archuletta's upcoming trial. Prater had been "waiting to get [Samora]" because of Samora's testimony.

¶5 After a few minutes in the parking lot, T.W. drove to Samora's house. The Jeep followed them. After T.W. parked on Samora's driveway, someone in the Jeep fired shots into T.W.'s car. At least five bullets struck the car; one of the bullets killed Samora. T.W. reported she saw two men in the Jeep.

¶6 After the shooting, Sheppard and Prater went to Donna Quintana's house. Prater lived with Quintana, who was his girlfriend at the time. Sheppard and his girlfriend, Sherilyn Valdez, also stayed at Quintana's house. Sheppard, Quintana, and Valdez later testified that upon hearing a local news channel report Samora's death, Prater celebrated by laughing, jumping up and

---

[1] "'On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly.' We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (citations omitted).

down, and commenting that Samora was "sleeping with the fishes." Prater instructed Quintana to remove his belongings from the Jeep and clean the vehicle.

¶7    Soon after hearing the news of Samora's death, Prater left for his cousin's house with Sheppard and Quintana because he became nervous that Quintana's neighborhood was getting too "hot." Prater sent Quintana back to her neighborhood with specific instructions to retrieve his gun and throw it into the Jordan River.

## I. Evidence Presented at Trial

¶8    The State charged Prater with aggravated murder, a first-degree felony, in violation of Utah Code section 76-5-202; obstructing justice, also a first-degree felony, in violation of Utah Code section 76-8-306; and discharging a firearm from a vehicle, near a highway, or in the direction of any person, building or vehicle, a third-degree felony, in violation of Utah Code section 76-10-508.

### A. Sheppard's Testimony

¶9    At trial, Sheppard identified Prater as the shooter. Sheppard testified that after he and Prater pulled out of the 7-Eleven parking lot, Prater said, "Follow [Samora], I will get out and smash him." Sheppard also testified that shortly after pulling up to Samora's house, Prater fired shots from the Jeep's window. Sheppard testified that Prater laughed when he saw the news that Samora had been killed. Sheppard recalled that Prater said "I knew I got him" and that Samora was "sleeping with the fishes."

¶10 Sheppard revealed that he had initially lied to police and denied any involvement in Samora's murder. Sheppard admitted that the State had offered him reduced charges if he agreed to testify against Prater. Sheppard also revealed a potential motive Sheppard would have had to harm Samora: Sheppard had previously dated a woman who—unbeknownst to Sheppard at the time—was married to Samora. Sheppard also testified that Samora had once thrown a retaliatory punch at him. Sheppard further testified that his current girlfriend, Valdez, had previously dated Samora.

### B. Quintana's Testimony

¶11 Quintana testified that when Prater learned from the news that Samora had been killed, Prater celebrated by jumping up and down and exclaiming that Samora was now "sleeping with the fishes." Quintana testified that she cleaned the Jeep and retrieved Prater's items at his request. Quintana also testified that Prater told

her where to locate the gun used to kill Samora and that, upon his request; she threw it into the Jordan River.

¶12 Quintana admitted that she "denied knowing anything whatsoever" about the shooting in her first interview with police. Quintana also testified that, in a second interview with police, she did not "tell them the truth about the gun" and that only "half" of what she said was truthful. Quintana admitted that at both the second interview and the preliminary hearing, she had been dishonest when she said, and then testified, that she had discarded a "package" because she knew she had thrown a gun into the river. On cross-examination, Quintana admitted she also lied at the preliminary hearing when she told the court that Prater had told her he was not involved in the shooting. She also confessed that, at the preliminary hearing, she lied about being asked to clean the Jeep. Quintana explained that she lied at the preliminary hearing because she was "scared" after people on both Prater's and Samora's sides threatened to kill her if she said anything. The jury heard that Quintana was arrested for aggravated murder but, after she promised to testify truthfully, she was charged only with obstruction of justice.

### C. Valdez's Testimony

¶13 Valdez's testimony corroborated Sheppard's and Quintana's testimony regarding what happened at Quintana's apartment after the shooting. Valdez testified that Prater said he "got [Samora]" and "unloaded . . . the whole clip." Valdez testified that Prater told her that he shot Samora and laughed about it. Valdez also remembered Prater's remark that Samora was "sleeping with the fishies."

¶14 Valdez admitted that she lied to police during her first interview by telling them that she and Sheppard had nothing to do with the shooting and were not at Quintana's home on the morning of the shooting. At the first interview, the police told Valdez that she was in danger of losing her children and going to prison because of her involvement with the events. Valdez testified that in a second police interview, after "[Sheppard] wasn't anything to [her]," she told the truth and explained what she saw and heard at Quintana's apartment after the shooting. The jury learned that Valdez faced no charges at any point in this case.

### D. The Letter to Red

¶15 While Prater was in prison, a housing officer found and collected a couple of envelopes outside Prater's jail cell. When the officer picked them up, Prater said, "give me my letters." The officer refused and kept them as evidence. One of the letters was addressed to "Red," the nickname for Prater's fellow inmate, Marcus Crocker, who had murdered a store clerk and, like Prater, would later receive a life-without-parole sentence.

¶16 The letter to Red explained that Samora "was getting ready to take the stand on [sic] [Prater's] homie [Archuletta]. But he had been hiding real good cause the homies was [sic] trying to find this fool for months but couldn't." Prater wrote, "I already knew this was probably going to be my only chance to get at this fool. So I like [sic] f*** it, we followed his ass to his crib and that was that."

¶17 In the letter, Prater admitted that he abandoned his gun in an alley before returning to the house and told Quintana to retrieve his items and clean the Jeep. Prater also recounted that he later instructed Quintana to find the gun and dispose of it in the Jordan River.

¶18 The state crime lab found Prater's fingerprints on the letter to Red. A handwriting expert who analyzed the letter testified that he could "neither identify nor eliminate Prater from authoring [the letter to Red] based on the known samples" of Prater's writing.

### E. Forensic Evidence

¶19 After the shooting, detectives found eight 9mm shell casings strewn along the roadside near T.W.'s car. They found six bullet holes in the car and recovered four bullets and some bullet fragments. Lab results showed that the casings and bullets came from the same gun.

¶20 At trial, a police detective testified that the location of bullet holes on three sides of the car indicated that the shooter was moving. Detectives determined that the shooter was likely the front-seat passenger. The detective testified that if the driver were the shooter, the driver would have been forced to either "shoot[] a passenger" or "put a bullet through his right rear passenger window"—a result of adjusting his aim while driving the moving vehicle. Furthermore, had the driver been the shooter, the shell casings, which semiautomatics generally eject to the right, would have ended up inside the moving vehicle—not on the roadway where they were found.

### F. Al-Rekabi's Testimony

¶21 In jail, Prater reconnected with Ali Al-Rekabi, a fellow inmate. Al-Rekabi also knew Sheppard from when they both lived at a halfway house. When Prater discovered Al-Rekabi's relationship with Sheppard, he asked Al-Rekabi to write a statement that pinned Samora's murder on Sheppard. Prater drafted the statement and Al-Rekabi transcribed it using his own words. Al-Rekabi testified that the statement presented a "story" in which Sheppard asked for Al-Rekabi's help to find "a gun big enough to get the job done."

¶22 Officers found a copy of the statement in Al-Rekabi's cell. Al-Rekabi later testified that the entire statement was a lie. He testified that Prater told him what actually happened. According to Al-Rekabi, Prater pointed an imaginary gun at his own head and said, "I got [Samora] but nobody knows but [Sheppard]."

¶23 The jury convicted Prater on charges of aggravated murder, obstructing justice, and discharge of a firearm from a vehicle. The district court sentenced Prater to life in prison without the possibility of parole for aggravated murder; one to fifteen years in prison for obstruction of justice; and three to five years in prison for each discharge of a firearm from a vehicle charge. Prater filed a notice of appeal.

### II. Prater's Insufficiency Claim

¶24 Prater argues that the State failed to present sufficient evidence at trial to support his convictions. He asserts that Sheppard, Quintana, and Valdez provided "inherently improbable" testimony because they "materially changed the testimony they had previously given the police or given under oath in court only after the prosecution promised them leniency in their own charges and sentences related to the events in question." Prater acknowledges he did not preserve this challenge for appeal and asks us to apply the plain error exception to the preservation rule.

¶25 We hear this claim under Utah Code section 78A-3-102(3)(i), which confers jurisdiction over "appeals from the district court involving a conviction or charge of a first degree felony or capital felony."

**ISSUE AND STANDARD OF REVIEW**

¶26 Prater contends that there was insufficient evidence to support any of his convictions. Prater failed to preserve this issue

because he did not move for directed verdict or otherwise challenge the sufficiency of the evidence supporting the jury's verdict.

¶27 We generally do not hear claims on appeal that were not presented to the district court. *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346 ("[C]laims not raised before the trial court may not be raised on appeal."). A claim is preserved before the district court "when it has been 'presented to the district court in such a way that the court has an opportunity to rule on [it].'" *Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828 (alteration in original) (citation omitted). "[I]t is clear that as a general rule, a defendant must raise the sufficiency of the evidence by proper motion or objection to preserve the issue for appeal." *Holgate*, 2000 UT 74, ¶ 16. "[T]he preservation rule applies to every claim . . . unless a defendant can demonstrate that 'exceptional circumstances' exist or 'plain error' occurred." *Id.* ¶ 11 (citations omitted). Recognizing that his claim is unpreserved, Prater argues that the district court plainly erred when it submitted the question of Prater's guilt to the jury based on the State's "inherently improbable evidence."

¶28 "[T]o establish plain error [based on insufficient evidence], a defendant must demonstrate first that the evidence was insufficient to support a conviction of the crime charged and second that the insufficiency was so obvious and fundamental that the trial court erred in submitting the case to the jury." *Id.* ¶ 17. Even if evidence is insufficient, we will not find plain error unless the insufficiency was "obvious and fundamental." *Id.* An example of an obvious and fundamental insufficiency is "the case in which the State presents *no* evidence to support an essential element of a criminal charge." *Id.*

¶29 Here, the court did not err, let alone plainly err, when it permitted the jury to hear the case.

## ANALYSIS

¶30 Prater asks us to set aside each of his convictions based on an insufficiency of the evidence. Prater primarily argues that Sheppard, Valdez, and Quintana offered "inherently improbable" testimony because they each received favorable treatment in exchange for testifying and because their testimony changed substantially after they accepted the State's offer. Without these three witnesses' testimony, Prater concludes, "there is no direct or circumstantial evidence upon which the defendant could be convicted by a reasonable jury and beyond a reasonable doubt." In other words, Prater contends that because the trio of witnesses

changed their testimony after receiving deals from the State, the testimony they each offered at trial was inherently dubious to the point that no reasonable jury could have relied on it to convict him.

¶31 As a general rule, the trial judge determines "whether . . . evidence is admissible," UTAH R. EVID. 104(a), whereas the finder of fact—in this case a jury—determines whether evidence is credible. *See State v. Workman*, 852 P.2d 981, 984 (Utah 1993); UTAH CODE § 78B-1-128(4) ("The jury is the exclusive judge of credibility."). Thus when conflicting or disputed evidence is presented at a jury trial, the "jury serves as *the exclusive judge* of both the credibility of the witnesses and the weight to be given particular evidence." *Workman*, 852 P.2d at 984 (emphasis added).

¶32 We are not normally in the business of reassessing or reweighing evidence, and we resolve "conflicts in the evidence in favor of the jury verdict." *Id.* But we have carved out an exception from this general rule. "In some unusual circumstances" we will conclude that the testimony presented to the jury was so unreliable that it cannot form the basis of a conviction. *Id.* The lead opinion in *Workman* posited that such an unusual circumstance exists when witness testimony "is so inconclusive or inherently improbable that it could not support a finding of guilt beyond a reasonable doubt." *Id*. In dicta, *Workman's* lead opinion suggested that to be inherently improbable the testimony must describe an action that was physically impossible or must be manifestly false "without any resort to inferences or deductions." *Id.*

¶33 In *State v. Robbins*, we expanded *Workman's* definition of inherently improbable testimony to "include circumstances where a witness's testimony is incredibly dubious and, as such, apparently false." 2009 UT 23, ¶ 18, 210 P.3d 288.[2] We criticized the court of

---

[2] We also restated *Workman,* opining and explaining that witness testimony is inherently improbable "if it is (1) physically impossible or (2) apparently false." *Robbins*, 2009 UT 23, ¶ 16, 210 P.3d 288. "Testimony is physically impossible when what the witness claims happened could not have possibly occurred." *Id.* ¶ 17. For example, testimony that an event "occurred on the moon" qualifies as physically impossible. *Id.* Testimony is "apparently false" when a "witness presents inherently contradictory testimony that is

(continued . . .)

appeals' definition of inherently false, finding it unduly narrow because it required that the challenged testimony be "improbable by its very nature." *Id.* ¶ 17 (citing *State v. Robbins*, 2006 UT App 324, ¶ 17, 142 P.3d 589). We also criticized its holding that "the inherently improbable testimony must . . . go to the very core of the offense." *Id.* (omission in original) (citation omitted). We corrected the court of appeals and clarified that "[s]ubstantial inconsistencies in a sole witness's testimony, though not directed at the core offense, can create a situation where the prosecution cannot be said to have proven the defendant's guilt beyond a reasonable doubt." *Id.*; *see also Campbell v. State*, 732 N.E.2d 197, 207 (Ind. Ct. App. 2000) (finding testimony inherently improbable when it runs so "counter to human experience" that "no reasonable person could believe" it). We held that only in instances "where (1) there are material inconsistencies in the testimony and (2) there is no other circumstantial or direct evidence of the defendant's guilt" may the district court "reevaluate the jury's credibility determinations." *Robbins*, 2009 UT 23, ¶ 19. In such a case, the district court may find that the testimony is apparently false.

¶34 Applying these principles in *Robbins*, this court held that a child's "testimony was so inherently improbable that the trial court had discretion to disregard it when considering whether sufficient evidence supported Robbins' conviction." *Id.* ¶ 13. In *Robbins*, a child accused Robbins, her stepfather, of sexual abuse. *Id.* ¶ 1. The child's testimony "suffered from multiple inconsistencies," which she tried to cover up with patently false statements. *Id.* ¶¶ 8, 22. For example, when attorneys asked why the child first said the abuse occurred when she was nine then changed her story to seven, she said she had a hearing problem, "a fact objectively not true." *Id.* ¶ 8. The child also "changed the description of what she was wearing at the time of the alleged incident." *Id.* Additionally, she gave conflicting testimony at trial. When asked if Robbins "ever spoke to her about the incident, she replied, 'Not that I remember. *I think that maybe once he might have said* that if I ever told anyone he would do it again or he would hit me more.'" *Id.* ¶ 9. Later in her testimony, the child explained she did not tell anyone about the abuse, "[b]ecause I had always been told that if I told anyone about him abusing me he

---

equivocal or the result of coercion, and there is a complete lack of circumstantial evidence of guilt." *Id.* ¶ 18 (citation omitted).

would abuse me more, or he would threaten to kill my dog, or something like that." *Id.* (alteration in original). Furthermore, the child explained she did not report her abuse to two DCFS investigators because she was afraid "because somebody told me there was going to be someone hiding in the closet and listening to everything that I said." *Id.* However, "the first DCFS interview took place in a room without a closet and was conducted before Robbins and Mother were informed of the allegations, so neither would have had the opportunity to tell her that someone would record her conversation." *Id.*

¶35 We held that "[the child's] inconsistent accounts regarding the extent of the physical abuse she suffered, her age when the abuse occurred, and what she was wearing at the time of abuse may alone be insufficient to invoke the inherent improbability exception." *Id.* ¶ 22. We suggested that a reasonable jury could still have credited the child's testimony even with the multiple inconsistencies because it might recognize that children may not be able "to identify with a high degree of reliability, and sometimes not at all, when an event in the past took place." *Id.* (citation omitted). We concluded, however, that "the patently false statements that [the child] made to cover up" the inconsistencies in her testimony were "sufficient to allow the court to reassess her credibility."[3] *Id.*

¶36 Another factor that motivated this Court to find an unusual circumstance allowing a departure from the general rule was that the child's testimony was the sole evidence supporting Robbins' guilt.

---

[3] The child's testimony suffered from other inconsistencies. Father, who had divorced Mother in part because of an affair between Robbins and Mother, "made a complaint to DCFS, alleging that Robbins was verbally and physically abusing [the child]." *Robbins*, 2009 UT 23, ¶¶ 3–4. When a DCFS investigator first asked the child about physical abuse, she told the investigator that Robbins never hit her. *Id.* ¶ 10. Two years and a couple of interviews after the first interview, the child's story had evolved into allegations that about once a week for four years, Robbins would enter her room, pull a book from the shelf, and hit her with it. *Id.* "Though these allegations of physical abuse do not bear directly on the alleged incident of sexual abuse, they reflect the pattern of inconsistency pervading [the child]'s testimony." *Id.*

*Id.* ¶ 1. We reasoned that because the child's testimony was fraught with inconsistencies, and since "no other evidence point[ed] to Robbins' guilt, these inconsistencies [were] sufficient to have allowed the trial judge to reevaluate [the child]'s credibility."[4] *Id.* ¶ 23.

¶37 Prater argues that Sheppard's, Quinata's, and Valdez's testimony are apparently false and inherently improbable. Prater points out that all three witnesses gave pre-trial statements that conflicted with their trial testimony. In pre-trial statements to police, Sheppard and Valdez denied that Sheppard played any role in the shooting. Quintana admitted that she originally lied to the police when she told them that she had no knowledge whatsoever of Samora's death. Prater argues that these conflicting statements qualify as "material inconsistencies" just as the statements that caused us to disregard the child witness's testimony in *Robbins* did.

¶38 This argument misreads *Robbins.* In *Robbins*, the child's additional patently false statements and not just her inconsistent accounts, which could be explained by her age and lack of sophistication, allowed the court to reassess her credibility. *See id.* ¶ 22. As noted above, we reasoned that inconsistencies in the child's testimony alone might not have rendered the child's testimony inherently improbable because a reasonable jury could have attributed those inconsistencies to the child's age and inability to

---

[4] The State asserts that "[t]his case stands nowhere near *Robbins*," in which one witness "provided the sole evidence of the defendant's guilt," because "*four* witnesses provided corroborating testimony," and "[t]he corroboration among those accounts alone takes [Prater]'s case outside of *Robbins*'s orbit." We disagree. The question of whether the State has presented evidence upon which a reasonable jury could convict would not change if four witnesses offered physically impossible testimony. To expand upon the example we provided in *Robbins*, four witnesses' testimony that an assault occurred on the moon suffers from the same inherent improbability as testimony offered by a single witness. While it is true that the lack of corroborating evidence significantly influenced our decision, *Robbins* should not be read as endorsing a view that a finder of fact can reasonably rely on inherently improbable evidence if the State introduces enough of it.

accurately identify when an event took place. *See id.* It was the inconsistencies in the child's testimony *plus* the patently false statements the child made *plus* the lack of any corroboration that allowed this court to conclude that insufficient evidence supported Robbins's conviction.

¶39 Similarly, here, the inconsistencies in Sheppard's, Quintana's, and Valdez's accounts by themselves are "insufficient to invoke the inherent improbability exception." *Id.* The jury learned that Sheppard, Quintana, and Valdez all made statements to police shortly after the shooting that contradicted their trial testimony. Prater fails to mention that each witness admitted at trial that he or she initially lied to police. Additionally, Quintana testified before the jury that she withheld information at the preliminary hearing only because she was afraid of Prater's or Samora's associates retaliating against her. That three trial witnesses who were tied to events surrounding a murder would deny their involvement when initially interviewed by the police does not run so counter to human experience that it renders their testimony inherently improbable. In other words, the three witnesses' pre-trial inconsistent statements do not render their testimony "apparently false." The question of which version of their stories was more credible is the type of question we routinely require juries to answer.

¶40 Prater further argues that the witnesses' testimony is especially dubious because each witness "received favorable reductions in their charges or sentencing." He notes that Sheppard and Quintana received lighter sentences in exchange for favorable testimony.

¶41 We reject the argument that Sheppard's and Quintana's plea deals automatically render their testimony apparently false.[5]

---

[5] In addition, Prater argues that Valdez lied when she testified that Prater was solely responsible for the murder, thus shielding Sheppard's involvement. Indeed, Valdez testified that she lied in her first interview with police after police threatened her that she may go to prison for her involvement in the shooting. Valdez also testified that at a second interview, she told the police the truth and revealed her and Sheppard's involvement. Valdez testified that her second interview and testimony reflected the truth. The jury was well positioned to consider Valdez's explanation for her shifting

(continued . . .)

Whether a witness testifies truthfully in light of favorable treatment offered by the State goes to the weight and credibility of the testimony. *See State v. Powell*, 2007 UT 9, ¶ 32, 154 P.3d 788 (holding that evidence showing a witness offered testimony in return for a plea bargain attacked only general witness credibility). "The jury is the exclusive judge of [witness] credibility." UTAH CODE § 78B-1-128(4). And we will not act as a second trier of fact. *State v. Boyd*, 2001 UT 30, ¶ 16, 25 P.3d 985; *see also White v. State*, 706 N.E.2d 1078, 1080 (Ind. 1999) (refusing to reassess the jury's credibility determinations when the "jury had the opportunity to determine the credibility of [the] witnesses in light of the incentives"). Any leniency the witnesses received in exchange for testimony was solidly before the jury when it made its credibility determinations. Prater's counsel had every opportunity to attack the witnesses' credibility because of the plea deals and to argue accordingly in front of the jury. To be clear, we do not foreclose the possibility that evidence of state-offered incentives may bolster a defendant's argument that the testimony presented at trial was apparently false. But a plea deal by itself does not come within shouting distance of successfully demonstrating that a witness's testimony is "apparently false" or that it falls under any of the other labels we have used to describe testimony that a reasonable jury could not rely upon to convict.

¶42 Prater also ignores a key consideration that led the *Robbins* court to find that the witnesses' inherently improbable testimony was insufficient to support a conviction. In *Robbins,* "no other circumstantial or direct evidence" supported the defendant's guilt. 2009 UT 23, ¶ 19. Prater focuses solely on Sheppard's, Quintana's, and Valdez's testimony. By so doing, he fails to acknowledge the substantial evidence the State presented that tied Prater to Samora's murder.

¶43 Significantly, Prater fails to address the handwritten letter to Red found outside his cell, which tracks the testimony of Sheppard, Valdez, and Quintana. Prater also ignores the corroborating forensic evidence that the Jeep's passenger likely fired the killing shot. Finally, Prater does not mention Al-Rekabi's testimony that Prater confessed to Al-Rekabi that he had killed Samora and enlisted Al-

---

story and to conclude which of her versions of events they believed. The changed story, standing alone, does not render the testimony inherently unreliable.

Rekabi's help to write a false statement pinning the crime on Sheppard.[6] In light of this evidence, there was no basis for the district court to conclude that this case presented the type of unusual circumstance that animated us to action in *Robbins* and to therefore depart from the usual course of allowing the jury to assess the credibility of witness testimony.[7]

---

[6] Failure to marshal this evidence violates rule 24 of our Rules of Appellate Procedure. Rule 24 sets forth "standards for the form, organization, and content of a brief on appeal." *State v. Nielsen*, 2014 UT 10, ¶ 33, 326 P.3d 645; UTAH R. APP. P. 24. It provides that "[a] party challenging a fact finding must first marshal all record evidence that supports the challenged finding." UTAH R. APP. P. 24(a)(9). In *Nielsen*, we repudiated the hard-and-fast notion of dismissing a claim based solely on "a technical deficiency in marshaling." 2014 UT 10, ¶¶ 37, 41.

This said, we reiterate what we said in *Nielsen*, that

> an appellant who seeks to prevail in challenging the sufficiency of the evidence to support a factual finding or a verdict on appeal should follow the dictates of rule 24(a)(9), as a party who fails to identify and deal with supportive evidence will never persuade an appellate court to reverse under the deferential standard of review that applies to such issues.

*Id.* ¶ 40. We focus on the "question of whether the appellant has established a basis for overcoming the healthy dose of deference owed to . . . jury verdicts." *Id.* ¶ 41. Prater does not marshal "all record evidence that supports the challenged finding." UTAH R. APP. P. 24(a)(9). He therefore fails to carry his heavy burden of persuasion required to overcome the "healthy dose of deference owed to . . . jury verdicts." *Nielsen*, 2014 UT 10, ¶ 41.

[7] We remind the appellate bar that counsel faced with trouble finding an argument that is not wholly frivolous may submit an *Anders* brief. The United States Supreme Court established in *Anders v. California* that appointed defense counsel must support an indigent client's appeal to the best of her ability to protect her client's constitutional rights to fair process and substantial equality. 386 U.S. 738 (1967). If, after a "conscientious examination" of a defendant's case, counsel finds the "case to be wholly frivolous," she should "so

(continued . . .)

**CONCLUSION**

¶44 The trial court did not err—let alone plainly err—when it submitted Prater's case to the jury. The inconsistencies between Sheppard's, Quintana's, and Valdez's pretrial statements and in-court testimony do not render their testimony apparently false. Moreover, ample additional evidence supports each of Prater's convictions. We affirm.

_____

advise the court and request permission to withdraw." *Id.* at 744. The withdrawal request must "be accompanied by a brief referring to anything in the record that might arguably support the appeal" and relevant legal authorities. *Id.* "A copy of counsel's brief should be furnished the indigent and time allowed him to raise any points that he chooses . . . ." *Id.*