2020 UT App 155

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF J.R.H.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

J.R.H.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20190419-CA
Filed November 13, 2020

Fourth District Juvenile Court, Spanish Fork Department
The Honorable F. Richards Smith
No. 455453

Bryson King and Douglas J. Thompson, Attorneys
for Appellant

Sean D. Reyes and Lindsey L. Wheeler, Attorneys
for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
DAVID N. MORTENSEN and JILL M. POHLMAN concurred.

HARRIS, Judge:

¶1 After a bench trial, the juvenile court found that J.R.H.—a juvenile—had committed assault, and therefore the court adjudicated J.R.H. delinquent. J.R.H. appeals, challenging the sufficiency of the evidence supporting the court's adjudication. We affirm.

BACKGROUND[1]

¶2      One afternoon, a teenage boy (Victim) made plans, via the online messaging app Snapchat,[2] to meet another boy he knew (Buyer) on a public street after school to sell a "vape pen." Victim was dropped off by a friend's mother near the arranged meeting spot; there is no evidence that either the friend's mother or Victim's own parents knew that Victim either possessed or intended to sell a vape pen. As Victim walked toward the meeting spot, he was approached not by Buyer but by two other juveniles, who—according to Victim's testimony at trial—both proceeded to beat him up and take the vape pen. In a police interview immediately following the incident, as well as at trial, Victim identified J.R.H. and J.R.H.'s cousin (Cousin) as the two

---

1. In an appeal from a bench trial in juvenile court, we view the evidence in the light most favorable to the juvenile court's ruling, *see In re J.E.G.*, 2020 UT App 94, n.1, 468 P.3d 1048; *see also Issertell v. Issertell*, 2020 UT App 62, n.2, 463 P.3d 698, and we recite the facts here with that standard in mind.

2. "Snapchat is a social media messaging application, which allows users to create multimedia messages, such as a photograph or a short video, and edit that multimedia to include text captions and other effects. Users are allowed to share that multimedia, called 'snaps,' to a private or semi-public group of users." *United States v. Gordon*, 339 F. Supp. 3d 647, 653 n.1 (E.D. Mich. 2018). Perhaps the most notable feature of Snapchat, as differentiated from other social media applications, is that the multimedia messages are automatically deleted soon after they are sent, unless saved by the user. *See id.* ("The primary concept behind the application is the capturing of moments: the multimedia created by users are only available for a short time before they become inaccessible.").

juveniles who assaulted him. It is undisputed that Victim was assaulted; indeed, Cousin later admitted to administering the beating. But J.R.H. has consistently denied any involvement, and the main contested issue at trial was whether J.R.H. had participated in the assault along with Cousin.

¶3     At trial, the court heard testimony from four witnesses: Victim, J.R.H., J.R.H.'s mother (Mother), and Cousin. Other than a photograph of Victim's injuries, there was no documentary evidence. Victim testified that, earlier on the day of the assault, he received harassing Snapchat messages from both J.R.H. and Cousin. Prior to that day, Victim had never met Cousin in person, and had had only one brief in-person interaction with J.R.H., at a high school basketball game a few months prior. After receiving the threatening Snapchat messages, Victim stopped communicating with J.R.H. and Cousin, but testified that, using a feature of the Snapchat app, his Snapchat "friends" could still ascertain his exact location. As Victim approached the spot where he was supposed to meet Buyer, two kids on bikes— whom Victim later identified as J.R.H. and Cousin—rode over to him and began shouting at him and asking if he was "J," which is his Snapchat username. After Victim responded in the affirmative, both J.R.H. and Cousin began assaulting him. According to Victim, J.R.H. tackled Victim and repeatedly punched him and Cousin kicked him in the face, causing Victim to start "blacking out." Victim testified that J.R.H. and Cousin ceased their assault when some passersby noticed the altercation and yelled, at which point J.R.H. and Cousin took the vape pen out of Victim's backpack and left the scene. Victim testified that, later that day, some of his other friends sent him pictures that J.R.H. and Cousin posted on social media, indicating that they had beat up Victim. According to Victim, one of the photos posted by J.R.H. was captioned, "I love you [Cousin]. Thanks for jumping . . . some guy with me to get this."

¶4     That same day, Victim contacted police to report what happened, and told an officer that both J.R.H. and Cousin had assaulted him. However, Victim did not tell the officer anything about the vape pen, and even at trial he initially dissembled about his reasons for meeting Buyer, not wanting to admit that he had been there to sell a vape pen. Victim explained that he held that part back because he didn't want either the officer or his parents to know that he was trying to sell a vape pen.

¶5     J.R.H. testified that he took no part in the assault. According to him, it was Cousin (and not Buyer) who had made arrangements to buy a vape pen from Victim, and J.R.H. testified that he and some other friends went to the meeting spot with Cousin to wait for Victim. But J.R.H. testified that he and the other friends left the scene before Victim arrived, while Cousin stayed behind alone. He testified that any assault was committed by Cousin alone, and that he played no part in it. This was the same account he gave to an investigating police officer in an interview that took place a few months after the incident.

¶6     Mother provided some evidence supportive of J.R.H.'s account, testifying that on the day in question J.R.H. and the other friends returned home several minutes before Cousin did. Cousin also corroborated J.R.H.'s account, testifying that he was the one who arranged to buy the vape pen from Victim, and that he was the only one who assaulted Victim, noting that he had admitted to the offense in separate juvenile court proceedings. However, Cousin acknowledged that, when he had first been contacted by police about the incident, he had "basically lied" and stated that he "had nothing to do with" the assault.

¶7     During his cross-examination of Cousin, the prosecutor noted that Cousin had been "laughing" while he was testifying "about beating this guy up," and offered his perception that

J.R.H. appeared to think "it was pretty funny" also.[3] Referencing this behavior, the court later stated that it was "really disgusted with the attitude that's being exhibited in the courtroom today" and specifically addressed Cousin, stating that his attitude was "totally inappropriate."

¶8     During closing argument, the prosecutor framed the case as a credibility contest, stating that it "boil[ed] down to a he-said-he-said sort of . . . situation." J.R.H.'s counsel agreed that the main issue was credibility, spending significant energies during closing argument to assert that Victim was not a credible witness. After the conclusion of the arguments, the court found that the State had met its burden to "prove its case beyond a reasonable doubt," and adjudicated J.R.H. as "responsible for the assault as charged."[4]

---

3. According to the transcript, the prosecutor stated that "J thought it was pretty funny over here." The transcript omits the full names of the juveniles involved and refers to each of them by first initial, which leads to some potential confusion because both Victim and J.R.H. have names that begin with J. However, the best reading of the transcript—and certainly the one most in keeping with our duty to view the testimony in the light most favorable to the juvenile court's findings—is that the prosecutor was referring to J.R.H. and not Victim as having laughed during Cousin's description of the beating.

4. The court made no additional findings, but none were required in this case. *See* Utah R. Juv. P. 44(a) (stating that, "[i]f, upon the conclusion of an adjudicatory hearing, the court determines that the material allegations of the petition are established, it shall announce its ruling," but that "[i]n cases concerning any minor who has violated any federal, state, or local law . . . , findings of fact shall not be necessary").

ISSUES AND STANDARDS OF REVIEW

¶9     J.R.H. appeals, challenging the juvenile court's conclusion that he committed the assault. His appellate challenge contains two components. First, J.R.H. asserts that Victim's testimony was "inherently improbable" and that the juvenile court should have "disregard[ed] it." *See State v. Robbins*, 2009 UT 23, ¶ 16, 210 P.3d 288.[5] Second, and relatedly, J.R.H. asserts that there was insufficient evidence to support a finding that he committed assault. "When reviewing a juvenile court's decision for sufficiency of the evidence, [an appellate court] must consider all the facts, and all reasonable inferences which may be drawn therefrom, in a light most favorable to the juvenile court's determination," and we reverse "only when it is against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." *In re V.T.*, 2000 UT App 189, ¶ 8, 5 P.3d 1234 (quotation simplified); *see also State v. Carrell*, 2018 UT App 21, ¶ 21, 414

---

5. As we did in *State v. Jok*, we elect not to address the issues—unbriefed by the parties—as to "whether, in a bench trial, the issue of inherent improbability needs to be specifically raised before the trial court in the first instance in order to preserve the issue for appeal," and "whether the inherent-improbability doctrine applies at all to bench trial verdicts, where the trial court has presumably not only determined that sufficient evidence existed but that this evidence met the burden of proof beyond a reasonable doubt." *See State v. Jok*, 2019 UT App 138, ¶ 20 n.8, 449 P.3d 610, *cert. granted*, 456 P.3d 386 (Utah 2019). In light of the fact that the State does not assert that J.R.H.'s inherent-improbability argument is unpreserved, or that the doctrine does not apply in appeals from bench trials, we simply proceed to address the argument on its merits. *See State v. Malo*, 2020 UT 42, ¶ 20 n.7, 469 P.3d 982.

P.3d 1030 ("We will reverse a guilty verdict for insufficient evidence only when the evidence is so inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crimes of which he was convicted.").

## ANALYSIS

### I

¶10　J.R.H. first asserts—citing *State v. Robbins*, 2009 UT 23, 210 P.3d 288—that Victim's trial testimony was inherently improbable, and that the juvenile court should therefore not have considered it in making its delinquency determination. Usually, courts are not "in the business of reassessing or reweighing evidence" already considered by a factfinder, and "conflicts in the evidence" are almost always resolved "in favor of the jury verdict." *State v. Prater*, 2017 UT 13, ¶ 32, 392 P.3d 398 (quotation simplified). But our supreme court has carved out a narrow exception to this general rule, under which a court may choose to disregard a particular witness's testimony as "inherently improbable," a condition that is present where testimony is "incredibly dubious and . . . apparently false." *See Robbins*, 2009 UT 23, ¶¶ 13, 18. However, a trial court may do so "only in those instances where (1) there are material inconsistencies in the testimony and (2) there is no other circumstantial or direct evidence of the defendant's guilt." *Id.* ¶ 19. Indeed, "[t]he existence of any additional evidence supporting the verdict prevents the judge from reconsidering the witness's credibility." *Id.*; *see also Prater*, 2017 UT 13, ¶ 38 (explaining that the *Robbins* court, in disregarding testimony, relied on "the inconsistencies in the [witness's] testimony *plus* the patently false statements the [witness] made *plus* the lack of any corroboration").

¶11 We have recently emphasized that the *Robbins* exception is "narrow" and that "[i]t is difficult to successfully establish such a claim on appeal." *See State v. Cady*, 2018 UT App 8, ¶¶ 17–18, 414 P.3d 974; *see also State v. Rivera*, 2019 UT App 188, ¶ 23 n.6, 455 P.3d 112 (stating that "[a] case which actually falls within the *Robbins-Prater* rubric is exceedingly rare," and noting that "we have not found a single Utah decision examined under that rubric that has reversed a verdict since *Robbins*"). In particular, our supreme court has refused to apply *Robbins* to garden-variety credibility questions, such as which witness to believe, or which version of a witness's conflicting account to believe. *See Prater*, 2017 UT 13, ¶ 39 ("The question of which version of their stories was more credible is the type of question we routinely require juries to answer."); *see also Robbins*, 2009 UT 23, ¶ 19 (stating that the *Robbins* exception does "not allow defendants to challenge witness testimony for generalized concerns about a witness's credibility" (quotation simplified)).

¶12 The situation presented here by the conflict between Victim's version of events and J.R.H.'s version of events is a typical credibility contest that does not implicate the concerns that were present in *Robbins*. Victim's testimony was neither "incredibly dubious" nor "apparently false," as opposed to the testimony of the alleged victim in *Robbins*. *See Robbins*, 2009 UT 23, ¶¶ 17–18, 22–23. There is nothing incredibly dubious about one teenager beating up another one to obtain something of value, such as a vape pen. And the account Victim gave at trial, while perhaps not airtight in its detail, was nowhere close to "apparently false." *See id.* ¶¶ 17–18.

¶13 Moreover, there was other evidence to corroborate at least portions of Victim's account. *See Prater*, 2017 UT 13, ¶ 38 (stating that a "lack of *any* corroboration" is required to implicate a *Robbins*-level inconsistency (emphasis added)); *see also Robbins*, 2009 UT 23, ¶ 19 ("The existence of *any* additional evidence supporting the verdict prevents the judge from reconsidering the

witness's credibility." (emphasis added)). Victim, Cousin, and J.R.H. all testified to being in the same area, on the same day, and at the same time, and all described knowledge of a transaction in which Victim was to sell a vape pen. And it is undisputed that Victim was in fact assaulted; not only do photographs support Victim's testimony on that point, but Cousin admitted to committing the assault. Certainly, not all points of Victim's testimony are corroborated by other evidence; in particular, there is no corroboration for his account of the most contested piece of evidence at trial: that J.R.H. participated in the assault along with Cousin. But "[c]orroborating evidence sufficient to defeat a *Robbins* claim does not have to corroborate the witness's account across the board, in every particular. It just has to provide a second source of evidence for at least some of the details of the witness's story." *State v. Skinner*, 2020 UT App 3, ¶ 34, 457 P.3d 421 (quotation simplified); *see id.* ¶¶ 33–35 (holding *Robbins* inapplicable due to corroborating evidence, even though the corroborating evidence did not go to the chief contested issue in the case); *see also State v. Crippen*, 2016 UT App 152, ¶¶ 15–16, 380 P.3d 18 (stating that, "although [the defendant]'s statements during the jailhouse phone call" that he had engaged in sexual activity with the witness "were not evidence of a lack of consent, those statements do tend to corroborate [the witness]'s overall account," and holding that the witness's testimony was therefore "not inherently improbable").

¶14    J.R.H. asserts that Victim's testimony was inherently improbable because the State failed to present additional corroborating evidence—like text or Snapchat messages, or testimony from other potential eyewitnesses such as the passersby that, according to Victim, broke up the fight—and because Victim's testimony contained other inaccuracies and inconsistencies, most notably his admission that neither his statements to police nor his initial trial testimony was completely truthful because he neglected to mention—apparently out of fear

of punishment for possessing or selling an illegal item—the fact that he was attempting to sell a vape pen. But while these items certainly provide excellent fodder for cross-examination, and might even lead to a rational conclusion by another factfinder that Victim was less credible than the other witnesses, they do not add up to the sort of inherent improbability that the *Robbins* exception is designed to capture.

¶15 Accordingly, we reject J.R.H.'s argument that the juvenile court should have completely disregarded Victim's testimony as inherently improbable under *Robbins*. The juvenile court did not err by implicitly determining that Victim's testimony cleared the *Robbins* threshold, and by considering it in making its ultimate adjudication of delinquency at trial.

II

¶16 Next, J.R.H. challenges the sufficiency of the evidence supporting the juvenile court's conclusion that J.R.H., along with Cousin, participated in the assault upon Victim. This challenge fails because Victim's testimony alone—which does not fall under the *Robbins* exception and which the court properly considered—is sufficient to support the court's conclusion.

¶17 Trial courts, including juvenile courts, have wide latitude to make credibility determinations, and we defer to such determinations, in part because trial courts have the opportunity to observe witnesses in a more fulsome manner than we do when we read their testimony only from a cold record. *See, e.g., Sauer v. Sauer*, 2017 UT App 114, ¶ 6, 400 P.3d 1204 (stating that appellate courts "give great deference to a trial court's determinations of credibility based on the presumption that the trial judge, having personally observed the quality of the evidence, the tenor of the proceedings, and the demeanor of the parties, is in a better position to perceive the subtleties at issue than we can looking only at the cold record" (quotation

simplified)); *In re E.R.*, 2001 UT App 66, ¶ 11, 21 P.3d 680 (stating that juvenile courts have "wide latitude of discretion" in making determinations after hearing evidence, not only because they have the "opportunity to judge credibility firsthand" but also because they are specially trained in juvenile matters (quotation simplified)). In this case, there are certain aspects of the witnesses' bearing that do not come through, at least not in the same way, to this court through the written trial transcript. In particular, the juvenile court expressed displeasure with the demeanor and outward expressions of at least Cousin, and perhaps also J.R.H., during the testimony, and appeared to take this into account when making its determination.

¶18    We recognize, as J.R.H. points out, that three witnesses testified on J.R.H.'s behalf, while only one witness—Victim— testified for the State. Even so, it is the factfinder's prerogative to "believe one witness against many, and to decide in conformity with declarations which produce conviction in its mind, rather than follow the many, if it so desire[s]." *See State v. Minousis*, 228 P. 574, 577 (Utah 1924); *see also* Model Utah Jury Instructions 2d CV121 (Advisory Comm. on Civil Jury Instructions 2020), https://www.utcourts.gov/resources/muji/inc_list.asp?action=showRule&id=1#121 [https://perma.cc/SLP5-6WSV] ("You may believe many witnesses against one or one witness against many.").

¶19    In this case, the juvenile court heard all of the witnesses testify, and in so doing was able to observe the witnesses' manner of speaking, demeanor, and other non-verbal modes of expression. After hearing the witnesses testify, and listening to the attorneys present closing arguments, the juvenile court credited Victim's version of events over J.R.H.'s and Cousin's versions. This determination was within the juvenile court's discretion and is not against the clear weight of the evidence. Accordingly, we reject J.R.H.'s argument that insufficient evidence supported the juvenile court's ultimate determination.

CONCLUSION

¶20   Victim's trial testimony was not inherently improbable under *Robbins*, and therefore the juvenile court did not err in considering that testimony in making its delinquency adjudication. The juvenile court's decision to credit Victim's version of events was within the court's wide discretion regarding credibility determinations, and the court's ultimate decision was supported by sufficient evidence.

¶21   Affirmed.

_____